FRED AND CARMELA MONTESI ET AL.,* PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 90665–90669. Filed June 13, 1963.

*Proceedings of the following petitioners are consolidated herewith: John and Yolanda Montesi, Docket No. 90666; Frank and Letitia D. Montesi, Docket No. 90667; Joe and Gloria Montesi, Docket No. 90668; and Louis F. and Evelyn Montesi, Docket No. 90669.

*Charles H. Davis*, for the petitioners.
*J. Larry Broyles*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax as follows:

| Docket No. | Petitioner | Year | Amount |
|---|---|---|---|
| 90665 | Fred and Carmela Montesi | 1956 | $3,277.02 |
| | | 1957 | 2,959.51 |
| | | 1958 | 3,567.00 |
| 90666 | John and Yolanda Montesi | 1956 | 2,308.46 |
| | | 1957 | 2,499.78 |
| | | 1958 | 3,572.61 |
| 90667 | Frank and Letitia D. Montesi | 1956 | 2,170.48 |
| | | 1957 | 1,396.84 |
| | | 1958 | 1,347.62 |
| 90668 | Joe and Gloria Montesi | 1956 | 2,309.04 |
| | | 1957 | 2,254.46 |
| | | 1958 | 3,708.88 |
| 90669 | Louis F. and Evelyn Montesi | 1956 | 3,125.03 |
| | | 1957 | 2,951.06 |
| | | 1958 | 3,466.56 |

The only issue raised by the petitions in these consolidated cases is whether the amount of $10,000 received by each of the petitioners Fred, John, Frank, Joe, and Louis F. Montesi in each of the years 1956, 1957, and 1958 constituted payments for the sale of goodwill in connection with the sale of retail food supermarkets, taxable as long-term capital gains, or payments for agreements by each of such petitioners not to compete with the purchaser of the supermarkets, taxable as ordinary income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioners, Fred and Carmela Montesi, John and Yolanda Montesi, Frank and Letitia D. Montesi, Joe and Gloria Montesi, and Louis F. and Evelyn Montesi, are husbands and wives residing in

Memphis, Tenn. They filed joint income tax returns for the calendar years 1956, 1957, and 1958 with the district director of internal revenue at Nashville, Tenn. The relationship between petitioner Fred Montesi and the other male petitioners is father and sons. Since the wife of each is a party to this proceeding only because she and her husband filed joint income tax returns for the years 1956, 1957, and 1958, the male petitioners will hereinafter be referred to as the petitioners.

Prior to October 1955 the petitioners conducted a retail grocery business in and around Memphis, Tenn., through a number of supermarkets operated by two corporations and three partnerships of which they were stockholders and members under the following trade names at the locations shown:

| Name and location | Operated by | Stockholders or members |
| --- | --- | --- |
| 1. Fred Montesi Supermarket No. 1, Memphis, Tenn. | Liberty Cash Grocers, Inc., a Tennessee corporation. | The Montesi family. |
| 2. Fred Montesi Supermarket No. 2, Memphis, Tenn. | A partnership_____ | The male petitioners and petitioner Carmela Montesi. |
| 3. Fred Montesi Supermarket No. 3, Memphis, Tenn. | _____do_____ | Same as #2 above. |
| 4. Fred Montesi Supermarket No. 4, Memphis, Tenn. | _____do_____ | Petitioners John, Frank, and Joe Montesi and D. C. Stignani. |
| 5. Fred Montesi Supermarket No. 5, Memphis, Tenn. | Liberty Cash Grocers, Inc_____ | See #1 above. |
| 6. Fred Montesi Supermarket No. 6, Jackson, Tenn. | Modico, Inc., a Tennessee corporation. | Petitioner Frank Montesi and his father-in-law, Leonard Dille. |
| 7. Liberty Cash Supermarket No. 2, Memphis, Tenn. | A partnership_____ | Petitioner Fred Montesi, Lucy Boren, and C. M. Cicalla. |
| 8. Liberty Cash Supermarket No. 7, Columbus, Miss. | _____do_____ | Petitioners John and Joe Montesi. |

The partnership interests of D. C. Stignani, C. M. Cicalla, and Lucy Boren were not appreciable in size and the contributions of these individuals to the success of the business were insignificant.

The first of the supermarkets, Fred Montesi Supermarket No. 1, was opened in 1948, and upon its successful operation others were opened in subsequent years. In September 1955 the petitioners were in the process of opening a new supermarket in the Memphis area, Fred Montesi Supermarket No. 8, which was to be operated by Liberty Cash Grocers, Inc.

None of the real property was actually owned by the petitioners or by their partnerships or corporations, but was leased from third parties. Liberty Cash Grocers, Inc., owned a warehouse which was used in connection with the operation of the above-described supermarkets.

The Fred Montesi supermarkets were modern. They contained in excess of 15,000 square feet per store, had ample parking facilities, and were among the largest retail grocery stores in size and volume in the city of Memphis in 1955, there being only about two or three other grocery stores in Memphis containing in excess of 15,000 square

feet at that time. The Montesi supermarkets advertised extensively in the Memphis area as a unit under the name of "Fred Montesi" and neon signs about 6 feet high and 10 to 12 feet wide containing the name "Fred Montesi Supermarket" were located in front of the supermarkets. The average aggregate yearly earnings from all the above-described supermarkets was about $600,000. In 1955 the only national food chains operating retail food stores in Memphis were A&P and Kroger.

Petitioner Fred Montesi had been in the retail food business in Memphis about 40 years and the Montesi family had been well known as retail food operators in the area for about 25 years. The Montesi supermarkets enjoyed an excellent reputation as retail grocery stores in the Memphis area and considerable goodwill attached to the name "Fred Montesi" in that area.

In the Memphis area, it is customary, in the sale of a successful going wholesale or retail grocery business, for the purchaser to pay a premium for the use of the trade name, as a part of goodwill, and for the seller, incidentally to the transfer of such goodwill, to enter into a covenant not to compete under such trade name for a specified time.

In 1955 the National Tea Co., hereinafter referred to as National Tea, a large national food chain, was interested in establishing retail grocery outlets in the Memphis area. It was desirous of obtaining a going chain of stores in Memphis, and through an agent approached the petitioner. The petitioner Fred Montesi desired to retire from business, but the petitioners were under no compulsion, financial or otherwise, to sell.

Negotiations were carried on between the petitioners and National Tea, during which the petitioners were represented by legal counsel. As a result of these negotiations between the petitioners and National Tea an agreement,[1] dated September 14, 1955, was signed by National Tea, on the one hand, and by petitioners and other interested individuals and representatives of the two corporations, on the other hand, providing for the sale to National Tea of the above supermarkets, along with other items set out in the agreement. Such agreement provided for a closing date of October 11, 1955. The agreement provided for an aggregate purchase price of the sum of (1) the price for the merchandise (to be a sum equal to the normal retail price of the merchandise located in the stores on September 17, less 16⅔ percent, and the lesser of cost or market value of the merchandise then located in the warehouse), (2) the price for the store fixtures (to equal the depreciated value as of such date as carried on the books, except

---

[1] The agreement was in letter form. This letter agreement had been prepared by officials of National Tea and forwarded to the petitioners.

that the amount to be attributed to leasehold improvements should not exceed $30,000), (3) the price for the warehouse and office fixtures and equipment (to equal the appraised and agreed value as of such date, but not in excess of $375,000), and (4) the sum of $400,000. Therein it was also agreed that the stores and warehouse would be operated for the benefit of National Tea from September 17 until the closing date. Therein it was agreed by the petitioners and other interested parties that they would procure from Liberty Cash Grocers, Inc., a lease in favor of National Tea covering the warehouse for a term of 15 years with certain options to renew, and would procure assignments to National Tea of leases to the various stores, parking lots, and other facilities, with consents of landlords where necessary. The agreement also contained the following provision:

Your paying the Purchase Price on the Closing Date and the undersigned's delivering a bill of sale of the Assets on the Closing Date are conditioned upon separate agreements being entered into between you and each of the following of the undersigned: Fred Montesi, Louis Montesi, John Montesi, Joe Montesi and Frank Montesi, relating to such persons not competing with you and your payment for such non competition, each of such agreements to be in substantially the form attached hereto as Schedule C and hereby made a part hereof. [Such form provided for yearly payments of $10,000 and was complete except for the insertion of the appropriate name.]

The agreement did not specifically provide for either the sale to, or use by, National Tea of the trade name "Fred Montesi Supermarket," nor did it specifically refer to the transfer of, or place a value on, "goodwill" in connection with the sale. In their negotiations the petitioners had suggested the use of the term "goodwill" in the agreement, but this was not acceptable to National Tea.

The closing of the sale took place on October 11, 1955, and the aggregate purchase price paid by National Tea pursuant to the agreement of September 14, 1955, was $2,771,379.95, consisting of (1) $1,418,565.07 for the merchandise, (2) $599,814.88 for the store fixtures, plus $30,000 attributed to the unamortized value of leasehold improvements, (3) $323,000 for the warehouse and office fixtures and equipment, and (4) the sum of $400,000.

Pursuant to the above-quoted provision of the agreement of September 14, each petitioner individually entered into a separate agreement on October 11, 1955, not to compete with National Tea. These separate agreements, including the consideration provided, were in accord with the form prescribed by the agreement of September 14, 1955. The agreement between National Tea and petitioner Fred Montesi, which is typical of each of the agreements, reads in pertinent part as follows:

Pursuant to agreement, dated September 14, 1955, National has today purchased from FRED MONTESI and certain other parties certain merchandise, store fixtures and warehouse and office fixtures and equipment theretofore owned by FRED MONTESI and such other parties and used in and about the business

of the operation of their retail stores and warehouse located in Jackson, Frayser and Memphis, Tennessee, and in Columbus, Mississippi, and National desires that FRED MONTESI does not enter into competition with such business as heretofore carried on by FRED MONTESI and such other parties during the period hereinafter mentioned and FRED MONTESI is willing to so not compete, all as on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of these presents and of the agreements hereinafter set forth, the parties hereto agree as follows:

1. FRED MONTESI agrees that he will not for a period of five (5) years commencing with the date of this agreement engage in or become interested in any business which competes with the aforesaid business heretofore carried on by FRED MONTESI and the above-mentioned other parties within the City of Memphis or within a radius of two hundred fifty (250) miles of Memphis (excluding, however, the city or village limits of Florence, Tuscumbia and Sheffield, Alabama), except that FRED MONTESI shall not be prohibited hereby from continuing or re-entering a wholesale jobbing grocery, produce and meat business, and in connection therewith to supply and render management or supervisory service, other than on a co-operative basis, to the Liberty Cash Grocery licensed or franchised stores.

2. National agrees that it will pay FRED MONTESI for not competing as aforesaid Ten Thousand ($10,000.00) Dollars on March 15, 1956 and Ten Thousand ($10,000.00) Dollars on the 15th day of each March thereafter to and including March 15, 1960, providing FRED MONTESI does not so compete during any of such years.

The total purchase price of $2,771,379.95 paid by National Tea for the merchandise, the store fixtures, the warehouse fixtures and equipment, and the office fixtures and equipment was allocated among the various supermarkets and the warehouse (and distributed to the owners thereof) as follows:

|  | Merchandise | Store fixtures | Lease-hold improvements | Additional sum | Warehouse and office fixtures and equipment |
|---|---|---|---|---|---|
| Fred Montesi Supermarket No. 1 | $55,141.65 | $75,542.46 | $14,475.07 | | |
| Fred Montesi Supermarket No. 2 | 55,829.95 | 68,204.26 | 5,154.83 | $120,000 | |
| Fred Montesi Supermarket No. 3 | 50,908.67 | 73,802.44 | 2,694.70 | 120,000 | |
| Fred Montesi Supermarket No. 4 | 54,409.86 | 115,180.76 | | 125,000 | |
| Fred Montesi Supermarket No. 5 | 44,793.53 | 109,268.88 | 3,220.73 | | |
| Fred Montesi Supermarket No. 6 | 37,599.83 | 113,308.29 | 2,007.07 | 25,000 | |
| Liberty Cash Supermarket No. 2 | 14,651.02 | 20,388.78 | 784.45 | 3,000 | |
| Liberty Cash Supermarket No. 7 | 26,964.04 | 24,119.01 | 1,663.15 | 7,000 | |
| Fred Montesi Supermarket No. 8 | | | | | |
| Warehouse | 1,078,266.52 | | | | $323,000 |
| Total | 1,418,565.07 | 599,814.88 | 30,000.00 | 400,000 | 323,000 |

After the closing of the sale on October 11, 1955, National Tea continued for a period of 9 months to a year to operate the eight existing stores under the name "Fred Montesi," advertising under such name and using the neon signs bearing the name "Fred Montesi Supermarket" in front of them. National Tea at first used its own name instead of "Fred Montesi" in connection with the new store described

as "Fred Montesi Supermarket No. 8." Later it added the name "Fred Montesi" to its own name on the sign.

After the sale National Tea attempted to employ petitioner Fred Montesi, who had been largely responsible for the success of the supermarkets but who was then 65 years old, but he refused. Petitioner Frank Montesi did work for National Tea after the sale for a little over one year. National Tea continued to employ most of the petitioners' 200 employes after the sale. It did hire a new manager in charge of the main office.

Pursuant to the separate agreements of October 11, 1955, each of the petitioners refrained from competing within the prescribed area for 5 years and each was paid by National Tea $10,000 per year for each of the 5 years commencing with 1956. None of these amounts was paid to the partnerships or corporations which had operated the stores and the warehouse.

In 1957 the petitioners obtained an interest in two supermarkets in Birmingham, Ala., which was outside the prescribed area. In October 1960, about 5 days after the expiration of the covenants not to compete, the petitioners opened a supermarket in Memphis, under the name Fred Montesi, containing 63,000 square feet, which was the largest grocery store in Memphis. It had taken the petitioners about a year and a half to prepare this store for operation and the store began showing a profit within 3 or 4 months.

In their income tax returns for each of the years 1956, 1957, and 1958 the petitioners Fred, John, and Joe Montesi reported as long-term capital gain the $10,000 received by each of them in such years from National Tea.

The petitioner Frank Montesi in his income tax return for each of the years 1956 and 1957 reported $10,000 received from National Tea in those years, less $71.40 "Expense of sale," as long-term capital gain. In his return for 1958 he did not report the amount received from National Tea in that year on account of the agreement not to compete.

In his income tax return for the year 1956 the petitioner Louis F. Montesi reported the $10,000 received by him in that year from National Tea as long-term capital gain. In his returns for the years 1957 and 1958 he did not report the amounts received in those years from National Tea.

In the notices of deficiency the respondent determined that each of the petitioners received the payments of $10,000 in the years 1956, 1957, and 1958 from National Tea in consideration of their refraining from competition in business with it, that such payments (less, in some instances, certain legal fees) were taxable to each of them as ordinary income under section 61 of the Internal Revenue Code of 1954 and that such amounts were not proceeds of a sale of capital

assets. Accordingly, he made appropriate adjustments to the taxable incomes of each of the petitioners for the years 1956, 1957, and 1958.

OPINION

The evidence as a whole shows that the Montesi supermarkets possessed substantial goodwill and that such supermarkets were transferred to National Tea as going businesses, including the goodwill.

The petitioners contend that the $10,000 payments received by them in each of the years 1956, 1957, and 1958 from National Tea, although designated in each of the separate agreements as payments made in consideration of agreements not to compete, were in fact payments made for the goodwill of the businesses transferred, and that the respondent erred in treating such payments as ordinary income. It is their position that the covenants not to compete constituted in reality the method of transferring the goodwill of the business to National Tea and are to be regarded as nonseverable from the overall agreement which transferred the going businesses.

The respondent, on the other hand, contends that the individual agreements not to compete are independent and severable from the sale of the assets, including any goodwill, that the payments in question were entirely for covenants not to compete, and that as such they are taxable as ordinary income.

We have heretofore stated the general rule, in *Rodney B. Horton*, 13 T.C. 143, appeal dismissed (C.A. 10) 180 F. 2d 354, as follows:

It is well settled that if, in an agreement of the kind which we have here, the covenant not to compete can be segregated in order to be assured that a separate item has actually been dealt with, then so much as is paid for the covenant not to compete is ordinary income and not income from the sale of a capital asset. *Estate of Mildred K. Hyde*, 42 B.T.A. 738. On the other hand, where the covenant not to compete accompanies the transfer of good will in the sale of a going concern and it is apparent that the covenant not to compete has the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which has been acquired, the covenant is regarded as nonseverable and as being in effect a contributing element of the assets transferred. *Toledo Newspaper Co.*, 2 T.C. 794; *Toledo Blade Co.*, 11 T.C. 1079; *Aaron Michaels, supra*.

It has been held that where the parties have specifically set out the covenants not to compete and have given them an assigned value, strong proof must be adduced to overcome that declaration. *Ullman* v. *Commissioner*, (C.A. 2) 264 F. 2d 305; *Hamlin's Trust* v. *Commissioner*, (C.A. 10) 209 F. 2d 761, affirming 19 T.C. 718; *Rogers* v. *United States*, (C.A. 9) 290 F. 2d 501; and *Emmette L. Barran*, 39 T.C. 515, on appeal (C.A. 5). In *Ullman* v. *Commissioner, supra*, the court stated:

The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon treatment which

reflects the parties' true intent with reference to the covenants, and the true value of them in money.

Here the separate agreement with each of the petitioners provides for payments specifically designated as payments for the agreements not to compete. It is true that the agreement of September 14, 1955, makes no mention of a transfer of goodwill, but merely purports to transfer tangible assets, including merchandise and fixtures and equipment. However, such agreement sets forth the manner of computing the price of each class of tangible assets, and provides for an additional payment of $400,000, without designation as to the consideration for such specified sum. The attorney who represented the petitioners in negotiations with National Tea testified that it was suggested that the term "goodwill" be included in the contract of sale, since both parties were in agreement that the intangible assets were to be transferred in connection with the businesses, but that the use of such word was not acceptable to National Tea.

We think it logical to conclude that the specific sum of $400,000 was intended by the parties to represent the consideration of any intangibles, including goodwill, and that the consideration provided in the covenants not to compete was not to any extent consideration for the transfer of goodwill. At least the petitioners, upon whom rests the burden of proof, have not proven otherwise. In this connection the petitioners argue on brief that the $400,000 represented a part of the consideration for the physical assets, particularly the store fixtures, contending that such fixtures had a value in excess of their depreciated cost (about $600,000), which was the purchase price of such assets set forth in the agreement. The petitioner John Montesi testified that the replacement cost of the fixtures would have been in excess of $1 million. However, replacement cost does not ordinarily represent fair market value of used fixtures. There is no other evidence to show that the assets had a fair market value in excess of the amount fixed by the parties to the contract, namely, the depreciated cost. Furthermore, there was no testimony or other evidence to show that the sum of $400,000 was intended to be consideration for the tangible assets. Indeed the distribution of the $400,000 among the several businesses obviously was not in proportion to the tangible assets of each.

The petitioners, in contending that the total amount of $250,000 ($10,000 to each of the five petitioners in each of the 5 years) to be paid pursuant to the separate agreements constituted payment for goodwill, rely upon the testimony of petitioner John Montesi that it is the usual and accepted method in the Memphis area to transfer the goodwill of a going grocery business by the use of covenants not to compete, and that the Montesi family considered the covenants not

to compete as being a part of a goodwill agreement. Another witness, Joseph R. Hyde, Jr., who was in the wholesale food distributing business in the Memphis area, testified that it was customary, in the sales of a successful going wholesale or retail grocery business, for the purchaser to pay a premium for the use of the trade name, as a part of goodwill, and for the seller, incidentally to the transfer of such goodwill, to enter into a covenant not to compete under such trade name for a specified time.

It seems to us, however, from a consideration of all the evidence, that the transfer of goodwill was not here effected by the covenants not to compete. We note that the goodwill pertaining to the businesses of three of the supermarkets belonged to two corporations, and not to the individual petitioners who received the amounts under covenants not to compete. Under such circumstances it has been held that the payments for the covenant not to compete are not to be considered as payments for the goodwill. *Richard Ullman*, 29 T.C. 129, affirmed in *Ullman* v. *Commissioner*, *supra*, and cases cited therein.[2] In addition, it is to be noted that each of the individual petitioners was to receive precisely the same amount, namely, $10,000 in each of the 5 years, whereas there is no showing that their respective interests, either directly or indirectly, in the goodwill of the businesses as a whole, were equal. Furthermore, there were other individuals outside the Montesi family who had interests in some of the businesses, and who signed the agreement to sell the businesses, who did not receive any part of the payments totaling $250,000. Although the testimony was to the effect that their interests were not of appreciable size and that the business name or reputation of such individuals did not contribute toward the successful operation of the stores, it would seem that they would nevertheless be entitled to some portion of the $250,000 if such amount in reality represented consideration for goodwill of the businesses in which they owned an interest. We think it must be concluded that they, as well as the petitioners, received their share of the consideration for the goodwill through the distribution of the $400,000.

Although the agreement of September 14, 1955, provided for, and was conditioned upon, the execution of the covenants not to compete, the fact remains that the consideration to be paid under such separate covenants was separately stated as being specifically for the agree-

---

[2] In *Cox* v. *Helvering*, (C.A.D.C.) 71 F. 2d 987, affirming a Memorandum Opinion of this Court, it was stated:

"If the $15,000 was paid to the selling corporation and distributed by it to its principal stockholder by some intracompany agreement, it might very well be designated, as the Commissioner designed it, a liquidating dividend, for in that case it would be a profit earned in the sale of capital assets. On the other hand, if it was paid directly to petitioner, as an ancillary agreement with the contract, it was to its extent a gain received by him in consideration of forbearing, rather than doing, personal services."

ments not to compete. It seems evident, considering the detail in the covenants as to the specific area in which competition was prohibited, as to the excepted areas, and as to other matters, that the consideration for noncompetition was carefully negotiated as an item separate and apart from the consideration for the transfer of the assets of the businesses. And it may be added that from the evidence it is clear that the agreements not to compete did have substantial value. The petitioners were experienced in the retail grocery business and had successfully competed with other national chains. Although the petitioner John Montesi testified that it was the intention of the Montesi sons to carry on a wholesale business, National Tea could not be assured, without the covenants, that they would not reenter the retail business. In fact, about 2 years after the sale the petitioners did open two supermarkets outside the prohibited area, and within a few days after the expiration of the covenants they opened, under the name "Fred Montesi," the largest supermarket in Memphis, which became a profitable operation within 3 or 4 months after the opening.

We have carefully considered all the cases cited by the petitioners, but since each case must be decided on the basis of its own facts, we find none of those cases conclusive here. The petitioners refer to the fact that in a number of cases this and other courts have held that the values fixed by the parties to a sale as representing goodwill and covenants not to compete were artificial and have reallocated the total consideration as between those two items. See, for example, *Ray H. Schulz*, 34 T.C. 235, affd. (C.A. 9) 294 F. 2d 52; and *George H. Payne*, 22 T.C. 526. However, in cases where this has been done there was clear evidence that the prices fixed by the parties were artificial. Here we cannot so conclude. The petitioners have not shown that the values fixed for the assets and for the covenants not to compete were not realistic.

In view of the foregoing, we conclude that the payments in question constituted consideration to the petitioners for their agreements not to compete, and that as such they are taxable as ordinary income.

*Decisions will be entered for the respondent.*