Fitzgerald Atkinson and Ruth P. Atkinson v. Commissioner.
Atkinson v. Commissioner
Docket No. 2951-62.
United States Tax Court
T.C. Memo 1964-137; 1964 Tax Ct. Memo LEXIS 195; 23 T.C.M. (CCH) 834; T.C.M. (RIA) 64137; May 18, 1964
William W. Berry, American Trust Bldg., Nashville, Tenn., for the petitioners. Vallie C. Brooks, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency in the income tax of petitioners for the year 1959 in the amount of $24,810.15. The issue for decision is whether any portion of the amount of $71,140 received by the petitioner Fitzgerald Atkinson pursuant to an agreement for the sale of his interest in a general insurance agency partnership, was either consideration for his covenant not to compete, an amount guaranteed to a retiring partner, or a payment for commissions or services rendered. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and attached exhibits are *197 herein incorporated by this reference. Petitioners, Fitzgerald Atkinson and Ruth P. Atkinson, are husband and wife and reside in Nashville, Tennessee. Petitioners filed their joint Federal income tax return for the taxable year 1959 with the district director of internal revenue at Nashville, Tennessee. In the latter part of 1946, Fitzgerald Atkinson (hereinafter referred to as petitioner) was employed as an insurance salesman or solicitor by Stokes-Bandy Company, a general insurance agency in Nashville. The agency was organized as a partnership in 1936 by Walter Stockes, Jr., and Joe H. Bandy, both of whom are well-known in insurance circles in Nashville. Stokes entered the insurance business in 1914 and has held many prominent positions in the community, including commissioner of revenue for the State of Tennessee. Bandy has been in the insurance business for about forty years and has held offices in the local, state, and national insurance associations. Petitioner continued with the partnership as a salesman until September 1950, when he joined a surety bond and casualty insurance company in New Orleans. He rejoined Stokes-Bandy Company in June of 1951 as manager of production *198 on a salary basis plus a percentage of the profits. Sometime prior to January 1, 1953, Stokes and Bandy offered to sell to petitioner a one-third partnership interest in the agency for $30,000. Petitioner rejected the offer and made a counteroffer of $15,000 which was accepted. On January 1, 1953, petitioner became a partner with a one-third interest and the agency name was changed to Stokes-Bandy-Atkinson Company. The consideration of $15,000, payable within 10 years, was paid by petitioner to Stokes and Bandy by the following payments: $4,500 in 1953, $1,500 in 1954, $1,500 in 1955, $3,000 in 1957, and $4,500 in 1958. The partnership agreement entered into by petitioner, Stokes, and Bandy provided that any partner could retire from the partnership upon giving 3 months' advance notice in writing to the other partners. In the event of such withdrawal by any partner, the continuing partners were given the option to purchase the interest of the withdrawing partner at a price equivalent to the book value of the withdrawing partner's interest. The agreement further provided: It is further expressly agreed that, should any partner withdraw from the partnership and then engage in the *199 general insurance business in the State of Tennessee, such withdrawing partner shall further pay to the agency a sum equivalent to the full local agent's commission received by him directly or indirectly from business of customers shown on the books of the agency, at the time of termination, for a period of five years following the effective date of termination. While the partners considered that the insurance renewals or expirations of the agency constituted partnership property, there were no express agreements concerning such ownership. On December 15, 1956, a new partnership agreement was entered into between Stokes, Bandy, petitioner, and Arnold E. Curtis. This agreement provided that in consideration of the transfer to the partnership of all policy renewals controlled by Curtis, including future earned commissions on business which could not be transferred, and payment by him of $21,000 in annual installments of not less than $3,000, Curtis had acquired a one-sixth interest in the partnership with the interest of the other partners, including petitioner, being reduced to five-eighteenths each. The name of the agency was changed to Stokes, Bandy, Atkinson & Curtis Company. *200 In order to alleviate disagreements and misunderstandings, such as had arisen over the hiring and supervising of office personnel and other managerial duties, the new partnership agreement specified that management responsibility was to be vested in Bandy, that sales responsibility was to be vested in the petitioner, and that any material changes contemplated in the performance of either function were to be discussed with all of the partners. Most of the provisions contained in the prior partnership agreement, including the arrangement for the partners to withdraw and the requirement to pay over commissions earned by a withdrawing partner from partnership customers for a five year period, were adopted and ratified in the new agreement. The provision for withdrawing was expanded to define "book value" (that amount to which the withdrawing partner is entitled) as the withdrawing partner's share of the net worth of the agency and to give a partner retiring for reasons beyond his control an additional payment in the amount of one-half of the death benefits provided for by the new agreement. During the period of time that petitioner held an interest in the partnership, its insurance *201 agency business consisted primarily of general insurance, including casualty, fire, and burglary insurance, and all types of surety bonds. It wrote a very nominal amount of life insurance. The casualty policies written by the agency were one-year policies. Fire insurance policies were written for one year, three years and five years, and the surety bonds were written for the life of the contract being bonded. The insurance commissions earned by the agency were: $65,595.58 in 1952; $79,665.79 in 1953; $82,216.03 in 1954; $96,788.32 in 1955; $105,497.88 in 1956; $115,695.68 in 1957; and $144,626.56 in 1958. For the first eleven months of 1958, petitioner was responsible for $257,873 of the $532,846 total premiums resulting from sales of general insurance by the agency. In addition to insurance premiums, the partnership received real estate commissions of approximately $11,000 each year for acting as the rental agent for a store and office building in Nashville. All of the net profits of the partnership were credited to the capital accounts of the partners and the net worth of the partnership, as reflected by its books, was the amount of unwithdrawn partnership profits in the capital *202 accounts of the partnership. In addition to such tangible assets as cash, notes and accounts receivable, and fixed assets, the partnerships, as is typical of general insurance agencies, had during the year in question valuable intangible assets in the nature of "expirations" (records of the agency containing a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance, premiums, property covered and terms of insurance), the name of the agency, the contracts for writing insurance with the insurance companies, and good will. The good will and other intangibles of the partnership had not been carried on the partnership books. It was customary in computing the value of intangible assets of general insurance agencies for purposes of sales in the Nashville area to multiply the prior year's gross commissions by 1 1/2. Toward the end of 1958 petitioner expressed a desire to leave the partnership. He was interested only in a sale of his partnership interest. He informed the other partners that he was unwilling to withdraw on the basis of what he would receive under the partnership *203 agreement - viz., the book value of his interest in the net worth of the partnership ($13,706.63 on December 31, 1958), or, if retiring for reasons beyond his control, the book value plus one-half of the death benefits ($30,000), the partnership agreement providing for a total payment of $60,000 to the personal representative of petitioner in the event of his death. Petitioner had been elected to the State Legislature of Tennessee which was to convene on January 5, 1959. In discussing his desire to leave the firm with Curtis, petitioner intimated that he was under terrific strain and pressure in the firm and that he had no plans to re-enter the insurance agency business. Upon Curtis' request that he put his offer to sell in writing, petitioner addressed a letter to partners Stokes, Bandy, and Curtis on December 16, 1958, the contents of which, in part, are as follows: As you know, I have been working under considerable pressure and I have become quite nervous, and my physician has very strongly advised and insisted that I get into a different type of business. I am, therefore, offering to sell my interest in the Stokes-Bandy-Atkinson & Curtis Insurance Agency, upon the following *204 terms: A. Seventy Thousand ($70,000) Dollars in cash, on closing date, or B. Eighty Thousand ($80,000) Dollars, payable as follows: 1. $30,000
in cash on closing date,
2. $20,000
one year thereafter,
3. $10,000
two years thereafter,
4. $10,000
three years thereafter, and
5. $10,000
four years thereafter.
The deferred payments to be without interest. Also, to be included in the purchase price, is my membership in the Richland Country Club which belongs to the agency. I wish to withdraw the balance to my credit in the capital account. * * * In accordance with our partnership agreement, I will agree not to engage in the general insurance business, in Tennessee for five years. I will also agree to do all that I can to preserve all business with which I have been associated, and to help the agency retain its customers or policyholders. As soon as practicable after adjournment of the 1959 legislature, I will, upon request, go with any representative or representatives of the agency to call on my customers to explain my reasons for leaving the insurance business as set out above, and endeavor to persuade them to continue to do business with the agency; *205 and I will, if you wish, write a letter to this effect to these policyholders. In other words, I will do all that I reasonably can to preserve and promote the good will of the agency. For your information, I have already prepared renewals of all business which I have produced or serviced which will come up for renewal during the first three months of 1959. I feel that my services have been and will continue to be of substantial benefit to the agency. During 1958 the business which I personally produced or serviced will produce premiums in excess of $275,000. In fact, the value which I have placed upon my interest, as set out above, is based upon gross commissions for one year on this business. With my cooperation, as set out above, I believe that the agency will be able to retain most of the policyholders I have dealt with. This offer contemplates a sale to be closed as of January 1, 1959. In view of the fact that the legislature convenes on January 5, and that I will be meeting with the Davidson County delegation before that, I request that you advise on or before December 22 whether or not my proposition is agreeable to you so that, if it is not acceptable, I can decide how *206 I must proceed. I will, of course, be glad to discuss this with all of you, but I thought that, to avoid any misunderstanding, it would be advisable to put my proposition in writing. Upon receipt of petitioner's letter, the continuing partners discussed at length the amount that was asked and decided to make a counteroffer, the basis of which was one-third of the amount 1 1/2 times commissions less brokerage commissions and less Curtis' interest. The counteroffer was promptly rejected, and on December 23, 1958, partners Stokes, Bandy and Curtis accepted petitioner's offer to sell by the following letter: Since receipt of your letter of December 16, 1958, in which you offer to sell your interest in Stokes, Bandy, Atkinson & Curtis Agency, we have discussed the matter among ourselves and we have decided to, and do now, accept your offer to sell your interest in the agency for $70,000.00 in cash. For strong business reasons, we have decided to form a corporation to be known as Stokes, Bandy, Atkinson & Curtis, Inc., and to have this corporation purchase your interest. In order that the corporation may have a full calendar year as its first fiscal year, and that the partnership *207 can be terminated on December 31st, the corporation will be chartered and will begin business on January 2, 1959; and will be in position to effect payment to you of the purchase price promptly thereafter. We sincerely wish you well and hope you will soon feel rested and restored to health. Please indicate your approval of this procedure for consummating the purchase and sale of your interest. The sale by petitioner of his interest in the partnership was consummated by a written sales agreement dated December 31, 1958, between petitioner as First Party and Stokes, Bandy & Curtis, Inc., a Tennessee corporation which was formed at the end of 1958 by the remaining partners to take over the operation of the partnership business, as Second Party. The sales agreement, prepared by the attorneys for the remaining partners, provided, in part, as follows: 1. FOR AND IN CONSIDERATION of the payment by SECOND PARTY to FIRST PARTY of the sum of Seventy Thousand Dollars ($70,000.00), and transfer to him of a certificate for a membership in the Richland Country Club, Nashville, Tennessee, receipt of which is hereby acknowledged by FIRST PARTY, and in further consideration of the covenants *208 and agreements of the parties, as hereinafter set forth, FIRST PARTY has bargained and sold, and by these presents does sell, assign and transfer to SECOND PARTY all of his right, title and interest in and to a partnership heretofore conducted by Walter Stokes, Jr., Joe H. Bandy, Fitzgerald Atkinson, and Arnold E. Curtis, under the firm name of Stokes-Bandy-Atkinson & Curtis, which may hereinafter be referred to the the "Agency", including, without limitation, all of FIRST PARTY's interest in and to an insurance trust agreement entered into by and between the said Stokes, Bandy, Atkinson and Curtis, with Third National Bank in Nashville, as Trustee, under date of January 5, 1957, and SECOND PARTY further agrees to transfer to FIRST PARTY ownership of a policy of life insurance, No. 2156042, issued by the New England Mutual Life Insurance Company of Boston, upon the life of FIRST PARTY. It is the intent of this agreement that henceforth SECOND PARTY shall be the sole owner of the interest of FIRST PARTY in the general insurance agency heretofore conducted under the name of Stokes-Bandy-Atkinson & Curtis, and that, subject to the obligations of SECOND PARTY to make payments, as herein *209 provided to be made to FIRST PARTY, the entire interest of FIRST PARTY in the said business is hereby terminated. 2. It is expressly understood and agreed that FIRST PARTY is entitled to receive the balance shown to his credit in the capital account of the books of the Agency, as of the close of business December 31, 1958, that is to say, the sum or sums of money credited or due to be credited to his account for the year 1958, less his previous withdrawals. * * *
4. In accordance with the terms of the partnership agreement heretofore existing between the said Stokes, Bandy, Atkinson and Curtis, which was executed under date of December 15, 1956, FIRST PARTY covenants and agrees with SECOND PARTY that for a period of five years, beginning January 1, 1959, he will not engage in or become financially interested, directly or indirectly, in any general insurance agency business in the State of Tennessee; and he shall do all that he reasonably can do to preserve for SECOND PARTY the business of the Agency with which he has been associated, and to help the Agency retain its customers or policy holders, and further, upon request, but subject to available time, go with any representative *210 or representatives of SECOND PARTY to call on former customers of FIRST PARTY, to explain FIRST PARTY's reasons for leaving the insurance business, and to endeavor to persuade them to continue to do business with SECOND PARTY; and upon request make written requests to that effect to those policy holders; and, in general, to do all that is reasonable to preserve and promote existing good will and business of the Agency. It is expressly understood and agreed that in the event FIRST PARTY should fail to comply in good faith with the obligations herein assumed by and imposed upon him, then and in that event SECOND PARTY shall have all rights as granted to the former partners of the Agency in paragraph (c) of Article VI of the Agency partnership agreement of December 15, 1956, or, at its option, any other rights or remedies as permitted by law. 6. [5] It is understood and agreed that SECOND PARTY proposes to continue the operation of the business, under the name, "Stokes, Bandy & Curtis, Inc.", and it is expressly agreed by FIRST PARTY that for a reasonable length of time, not to exceed one year after January 1, 1959, SECOND PARTY shall have the right in advertising, and in all other *211 legitimate means, to designate its said business as being the successor to Stokes-Bandy-Atkinson & Curtis, and during said period SECOND PARTY may use printed supplies presently on hand, bearing the name Stokes-Bandy-Atkinson & Curtis. 7. [6] It is agreed that the parties will promptly release a joint statement or announcement to the press, concerning the dissolution of the partnership. 8. [7] This instrument contains the entire agreement between the parties, and there are no collateral understandings or agreements not embodied herein, and no variation or alteration of the terms of this Agreement shall be binding upon any of the parties unless reduced to writing and executed by all parties; and this instrument shall inure to the benefit of and be binding upon, the personal representatives, successors and assigns of the parties. There was no negotiation between petitioner and the other partners as to any matters contained in his offer to sell or the sales agreement other than the negotiation over the total sales price. Following the consummation of the sale, form letters with the letterhead "STOKES, BANDY & CURTIS, INC., Successors To STOKES, BANDY, ATKINSON & CURTIS" followed *212 by the names of the former partners, including petitioner, were mailed to customers of the agency, such letter being as follows: We know that you have seen in the paper the announcement that we have purchased the partnership interest of Jerry Atkinson, and that you have a natural interest in this change in our agency. With the statement that he was acting on his doctor's insistence that he get into another line of business Jerry solicited us to purchase his interest in this agency, and pledged that he would cooperate fully in helping us retain the business of his customers, and he would not engage in the general insurance agency business, directly or indirectly, in the State of Tennessee for a period of five years. We accepted the offer at his asking price, and we are now eager to make a personal call on you to make our pledge of continued service. Until he or we can contact you in person we have felt that this letter would afford you a picture of the situation and we trust that you will allow us to continue to serve you, whom we consider a very valuable client. Yours very truly, /s/ Walter Stokes, Jr., /s/ Joe H. Bandy, /s/ Arnold E. Curtis Petitioner did not engage in *213 the general insurance agency business in Tennessee during the five years after he sold his interest in the partnership, and he was not requested by the continuing partners to call on any of the agency's customers after selling his interest. In accordance with the sale agreement petitioner received the balance of $13,706.63 in his capital account as of December 31, 1958; $70,000 in cash, a life insurance policy; and a membership certificate in the Richland Country Club of Nashville, which had a value of $1,140. The $70,000 cash was reported on petitioners' joint income tax return for 1959 as follows: Gross sales price of interest in
insurance agency
$70,000
Cost or other basis
15,000
Long-term capital gain
$55,000 Petitioner concedes that he incorrectly failed to report the value of the country club membership and that he overstated his basis in computing the long-term capital gain by $7,000 which he received by virtue of Curtis' buying an interest in the partnership in 1956. Petitioner also concedes that if the amount received under the sales agreement is subject to capital gain treatment, the gain should be reported as follows: Sales price
$71,140
Basis adjusted
8,000
Long-term capital gain
$63,140
*214 Ultimate Findings The amount of $71,140 received by petitioner was in consideration for the sale of his interest in the partnership business. No part of the consideration represented payment for petitioner's agreement not to engage in the insurance agency business, an amount guaranteed to a retiring partner under the partnership agreement, or payments for commissions or services rendered. Opinion The sole issue to be determined is the proper tax treatment to be accorded the payment of $71,140 made to petitioner pursuant to the agreement terminating his partnership interest. [1]
Contending that the $13,706.63 balance in petitioner's capital account was the only amount petitioner was entitled *215 to receive for his partnership interest, respondent has determined that the $70,000 in cash and the country club membership valued at $1,140 received by petitioner pursuant to the sales agreement are includible in ordinary income on the theories (1) that the total payment was made in consideration of petitioner's covenant not to engage in the general insurance business in Tennessee for 5 years and (2) that if any portion of the payment was not made in consideration for his covenant not to compete, then such portion constituted an amount guaranteed to a retiring partner under the partnership agreement and/or a payment for future commissions or anticipated services. Petitioner maintains that the $71,140 payment was made in exchange for his interest in the partnership and should be taxed as a capital gain under section 741 of the Internal Revenue Code of 1954[2] which provides that the sale or exchange of an interest in a partnership shall be considered the sale or exchange of a capital asset, with exceptions not relevant to the case in hand. We agree with the petitioner. *216 In a long line of cases [3] it has been held that where a covenant not to compete accompanies the sale of an interest in a going business and has the primary function of assuring to the purchaser the beneficial enjoyment of the property acquired, the covenant is in effect a contributing element to the assets transferred. The rule is stated in Aaron Michaels, supra: If such an agreement can be segregated, not so much for purposes of valuation as in order to be assured that a separate item has actually been dealt with, the agreement is ordinary income and not the sale of a capital asset. Estate of Mildred K. Hyde, 42 B.T.A. 738. But where it accompanies the transfer of good will in the sale of a going business and it is apparent that the covenant not to compete has the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which he has acquired, the covenant is regarded as nonseverable and as being in effect a contributing element to the assets transferred. Toledo Newspaper Co., 2 T.C. 794; Toledo Blade Co., 11 T.C. 1079. *217 In each case it is necessary to look at the entire transaction to see what the parties bargained for. In the instant case there is not an iota of evidence that there was any discussion or agreement or understanding that any part of the payment received by petitioner was consideration for his covenant not to compete. Clearly the instruments of sale do not allocate any portion of the consideration to the covenant or reflect in any way that a separate item was actually dealt with by the parties. Cf. Fred Montesi, 40 T.C. 511 (1963), on appeal (C.A. 6, Nov. 4, 1963), and David H. Ullman, 29 T.C. 129 (1957), *218 affd. 264 F. 2d 305 (C.A. 2, 1959), cases cited by respondent, where the taxpayer-vendors executed separate agreements for the covenants not to compete which provided for payments specifically designated as payments for such covenants. Here, as in most cases of this type, where the tax consequences to the buyer and seller are necessarily antithetical, depending upon whether the covenant not to compete is or is not an item separately dealt with, it was important to the parties to agree upon a treatment that clearly reflected their true intent. In addition to tax considerations, respondent, in an attempt to emphasize further the importance of the covenant in this instance, has injected the additional factor that due to distrust resulting from prior disagreements and misunderstandings, the continuing partners would not have purchased petitioner's interest without his covenant not to compete. It is to be observed, however, that the purported disagreements occurred some two years prior to the sale in question and that the testimony of Stokes and Bandy to the effect that they would not have purchased petitioner's interest in the business without his covenant is conducive *219 to a finding that the covenant was ancillary rather than symmetrical to the sale of the partnership interest. But, in any event, this factor, if rightly an item of concern, is all the more reason for the purchasing party, whose tax counsel drew up the sales agreement, to reach some definite and mutual agreement with petitioner concerning the covenant. Yet the sales agreement does not provide for the covenant as a separate and distinct item of value and petitioner's testimony that there was no negotiating in regard to the covenant is unrefuted. Furthermore, the evidence shows that the consideration of $71,140 received by petitioner pursuant to the sales agreement was a fair price for his partnership interest irrespective of the covenant not to compete. In accordance with the customary practice in the Nashville area, petitioner, in his offer to sell, based the value of the partnership interest upon gross commissions of the agency for the preceding year. This means of evaluating insurance businesses, designed to take into account such primary assets of an insurance agency as expirations and good will and other intangibles which are not carried on the partnership books, had been used *220 by the partnership in previous transfers of its partnership interests. Petitioner's offer, computed on this basis, was accepted in an arm's length transaction with no understanding that any portion of the consideration was for anything other than his interest in the partnership. It is clear that what petitioner sold and what Stokes, Bandy & Curtis Inc., acquired was an interest in a going business with substantial good will. The partnership had built up a large clientele, due in part to the efforts of Stokes and Bandy before petitioner joined the firm and in part to his efforts after joining the firm. These accounts, with the probability that the clients would resort to the old place, see Malcolm J. Watson, 35 T.C. 203 (1960), constituted the good will of the agency's business. In selling his interest in the partnership, petitioner also intended to convey his interest in the good will and expirations of the agency. That this was his intent is obvious from the sales agreement which provided: "* * * in general, [petitioner agrees] to do all that is reasonable to preserve and promote existing good will and business of the Agency." In addition to the implied agreement *221 that a seller of a business will not interfere with purchaser's beneficial use of the business acquired and "[in] accordance with the terms of the partnership agreement" to which he had previously committed himself, petitioner covenanted not to engage in the general insurance agency business for 5 years. This agreement, in our opinion, was but an integral part of the entire agreement for the sale of petitioner's interest in the partnership. In like manner, we view the petitioner's agreement to contact customers in order to persuade them to continue to do business with the agency to be but an additional contributing element in the transfer of his interest in the partnership and its good will. Petitioner was not obligated to perform any specific amount of services at any particular time and was not, in fact, subsequently called upon to render any such services. The parties to the contract assigned no value or consideration to these services and we will not presume to rewrite the contract by attributing any part of the payment to them. Respondent's final contention that part of the consideration received by petitioner is ordinary income is based on section 736(a) of the Code [4] *222 which provides that payments made in liquidation of the interest of a retiring partner or a deceased partner shall be considered as a distributive share of partnership income if the amount is based on the income of the partnership or a guaranteed payment described in section 707(c) of the Code [5] if the amount is not based on partnership income. *223 We have determined that section 736(a) is not applicable in this case for the reason that petitioner did not retire or liquidate under the partnership agreement. Petitioner emphatically refused to sever his relationship with the agency in accordance with the withdrawal provisions of the agreement. All of the evidence indicates a clear intention on the part of petitioner to sell, and Stokes, Bandy & Curtis, Inc., to purchase petitioner's partnership interest notwithstanding the withdrawal provisions of the partnership agreement. The offer to sell, the letter of acceptance, the sales agreement, and the form letters mailed to customers by the remaining partners are all couched explicitly in terms of "sell" and "purchase." Cf. V. Zay Smith, 37 T.C. 1033 (1962), affd. 313 F. 2d 16 (C.A. 10, 1962), where payment was made by the partnership and the partnership interest in question was liquidated rather than purchased. In the very recent case of David A. Foxman, 41 T.C. 535 (1964), we had before us the similar problem of determining whether a partner in transferring his interest in a partnership to the other partners had "sold" his interest within *224 the meaning of section 741 or had "liquidated" his interest within the meaning of section 736. We there said: Where the practical differences between a "sale" and a "liquidation" are, at most, slight, if they exist at all, and where the tax consequences to the partners can vary greatly, it is in accord with the purpose of the statutory provisions to allow the partners themselves, through arm's-length negotiations, to determine whether to take the "sale" route or the "liquidation" route, thereby allocating the tax burden among themselves. The record in this case leaves no doubt that the parties herein intended a sale of the partnership interest to Stokes, Bandy & Curtis, Inc., and we have so found. Having rejected respondent's contentions that part of the $71,140 received by petitioner was consideration for his covenant not to compete, compensation for past or future services, or a guaranteed payment to a retiring partner, we conclude that pursuant to the sales agreement petitioner transferred his partnership interest, a capital asset under section 741, and that the gain on such transfer *225 is taxable as capital gain. To take into account concessions made by the petitioner, Decision will be entered under Rule 50. Footnotes
1. The $13,706.63 amount received by petitioner In addition to the $71,140 represented the balance in his capital account, i.e., principally his unwithdrawn share of the partnership profits, reportable by him in the year earned by the partnership. The cash surrender value of the insurance policy received by petitioner was set included in respondent's deficiency determination because the premiums on the policy were purportedly paid out of petitioner's share of the partnership income.↩
2. SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE. In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751↩ (relating to unrealized receivables and inventory items which have appreciated substantially in value).
3. Aaron Michaels, 12 T.C. 17 (1949), acq. 1949-1 C.B. 3; Ray H. Schulz, 34 T.C. 235 (1960), affd. 294 F. 2d 52 (C.A. 9, 1961); George J. Aitken, 35 T.C. 227 (1960); Merle P. Brooks, 36 T.C. 1128 (1961); Edward v. Kenny, 37 T.C. 1161 (1962); Commissioner v. Killian, 314 F. 2d 852 (C.A. 5, 1963) affirming a Memorandum Opinion of this Court; and Karan v. Commissioner, 319 F. 2d 303↩ (C.A. 7, 1963), affirming under that style Memorandum Opinions of this Court.
4. SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST. (a) Payments Considered as Distributive Share or Guaranteed Payment. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered - (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c)↩ if the amount thereof is determined without regard to the income of the partnership. 5. SEC. 707. TRANSACTIONS BETWEEN PARTNER AND PARTNERSHIP. * * *
(c) Guaranteed Payments. - To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a)↩ (relating to trade or business expenses).