GLENN C. OURY and ELOISE OURY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Oury v. Commissioner
Docket No. 4800-72.
United States Tax Court
T.C. Memo 1975-363; 1975 Tax Ct. Memo LEXIS 15; 34 T.C.M. (CCH) 1568; T.C.M. (RIA) 750363; December 22, 1975, Filed *15 Glenn C. Oury, pro se. Donald W. Mosser, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' income taxes of $6,977.22 for 1968 and $5,103.32 for 1969. Respondent also determined additions to the tax under section 6653(a) [1] of $348.86 for 1968 and $255.17 for 1969. Respondent has conceded the additions to the tax, and the parties have settled many other issues. There are only three remaining: (1) Whether Glenn C. Oury (hereinafter petitioner) realized income in 1968 and 1969 when his employer made payments on a judgment note petitioner had executed; (2) whether the fair market value of stock petitioner received in an exchange of stock was $25,000; and (3) whether respondent's determination of petitioner's deductions for interest expenses is correct for 1968 and 1969. [2]
*16 FINDINGS OF FACT Some facts were orally stipulated and are found accordingly. Petitioner and Eloise, his wife, resided in Springfield, Illinois, when they filed joint 1968 and 1969 income tax returns and in Worthington, Ohio, when they filed their petition in this case. Mid-States Management Corporation (hereinafter Mid-States), an Illinois corporation, managed properties for a real estate investment trust. In March of 1967, petitioner acquired 100 common shares of Mid-States, all of its issued and outstanding stock, for $45,000 and became Mid-States' president. He remained president of Mid-States during all of 1968 and part of 1969. Petitioner bought the Mid-States stock with funds he received by executing a judgment note (hereinafter note) in favor of First Illinois Mortgage Company (hereinafter First Illinois) for $45,000, with interest thereon at six percent a year. Petitioner was to pay First Illinois $500 per month until the debt was discharged. During 1967, Mid-States, rather than petitioner, paid $4,500 on petitioner's note. Petitioner reported $4,500 on his 1967 income tax return as miscellaneous income from Mid-States, taking a deduction for that portion which *17 constituted interest. During 1968, Mid-States paid $5,500 on petitioner's note. Petitioner did not report the $5,500 as income on his 1968 return, but he did claim a $2,800 interest deduction relating to the stock purchase. During 1969, Mid-States paid $1,500 on petitioner's note. Petitioner did not report the $1,500 as income on his 1969 return or deduct interest relating to the stock purchase. In April of 1969, petitioner agreed to sell all of his Mid-States stock to American States Investor's Corporation (hereinafter American). Petitioner's basis in the Mid-States stock was $45,000 at the time of sale. In the written agreement of sale as partial consideration for the Mid-States stock, American agreed to issue petitioner capital stock of American "having a fair reasonable market value of not less than $25,000.00" and further agreed to assume payment on the balance of petitioner's note, $38,314.66. Petitioner received the American stock in 1969 pursuant to the agreement. On his 1969 income tax return, Schedule D, petitioner reported in the exchange of his Mid-States stock for the American stock that the gross sales price of the Mid-States stock was $25,000, that the cost or other *18 basis of his Mid-States stock was $23,000, that he realized a net long-term capital gain of $2,000, and that half of this amount, $1,000, was includable in income. Petitioner's 1969 income tax return, Schedule D, also contained the following entry: MIDCENTURY LEASING STOCK EXCHANGED FOR STOCK OF AMERICAN STATES INVESTORS BASIS OF MIDCENTURY LEASING 0 MARKET VALUE OF AMERICAN STATES INVESTORS 0 Respondent's notice of deficiency determined that petitioner realized income of $5,500 and $1,500 in 1968 and 1969, respectively, because of Mid-States' payments on petitioner's note. Respondent further determined that $2,255.84 and $583.89 in 1968 and 1969, respectively, represented interest on the note and that petitioner could deduct such amounts as interest expenses. Respondent also determined that petitioner's taxable gain on the sale of his Mid-States stock was $9,157.33 instead of $1,000, computed as follows: Note assumed by American
$38,314.66
Fair market value of stock of
American
25,000.00
Amount realized for stock of
Mid-States
63,314.66
Less: Cost or other basis
45,000.00
Long-term capital gain
18,314.66
Less: 50% of $18,314.66
9,157.33
Taxable gain from sale or
exchange of property
$ 9,157.33
*19 ULTIMATE FINDINGS OF FACT Petitioner received additional compensation from Mid-States of $5,500 in 1968 and $1,500 in 1969 because of Mid-States' payments on his note. The fair market value of the American stock was $25,000 when petitioner received it in exchange for his Mid-States stock. Of the payments Mid-States made on petitioner's note, $2,255.84 and $583.89 constituted interest in 1968 and 1969, respectively. OPINION In March of 1967, petitioner purchased 100 common shares of Mid-States Management Corporation for $45,000 with borrowed funds. He acquired the borrowed funds by executing a judgment note in favor of First Illinois Mortgage Company for $45,000, plus interest at six percent a year. He was to repay First Illinois $500 per month until the debt was discharged. Petitioner was president of Mid-States during part of 1967, all of 1968, and part of 1969. During each of those years, Mid-States made payments on petitioner's note. The first year, 1967, is not in issue; in 1968, Mid-States paid $5,500 on petitioner's note; in 1969, it paid $1,500. In 1969, petitioner sold his Mid-States stock. In the written agreement of sale as partial consideration for the Mid-States *20 stock, the purchaser, American States Investor's Corporation, agreed to issue petitioner capital stock of American "having a fair reasonable market value of not less than $25,000.00." The first issue is whether Mid-States' payments on petitioner's note constituted income to petitioner, president of Mid-States. The second issue is whether the fair market value of the American stock was $25,000, as stated in the written agreement between petitioner and American, or whether it was valueless, as petitioner contends. We will treat these two issues together since petitioner's argument is the same for both. Corporate payments for the personal benefit of an employee constitute income to the employee on whose behalf payments are made. Alex Silverman,28 T.C. 1061 (1957), affd. 253 F. 2d 849 (8th Cir. 1958). Mid-States made payments on petitioner's note, thereby relieving him of the necessity of making payments himself. If we look to the form of the transaction alone, such payments clearly constitute income. If we look to form, the answer to the second issue is equally clear, since the agreement between petitioner and American stated that American would issue *21 him capital stock "having a fair reasonable market value of not less than $25,000.00." Petitioner asks us not to look to the form but the substance of the transactions. Petitioner contends that one R. M. Johnston hired him to run Mid-States. He further contends that when he purchased the Mid-States stock, he also signed a document (hereinafter option) allowing American to "pick up" his Mid-States stock for a thousand dollars. Petitioner alleges that Johnston controlled [3] American and, through American's option, Johnston also controlled petitioner. According to petitioner, Johnston had him sell his Mid-States stock to American to prove to potential investors that the American stock had value. Petitioner argues that the American stock was, in fact, valueless at the time he sold his Mid-States stock to American and that he would not have done so had Johnston not controlled him and forced him to sell. He also argues that Mid-States' payments on his note did not constitute income since he "wasn't going to get anything anyway * * *." We assume he means because of the option, for a thousand dollars, the Mid-States stock could have been taken from him at anytime. *22 Petitioner, of course, has the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. When respondent determines that the form of a taxpayer's transactions reflects the true substance of those transactions, taxpayer must present strong proof to overcome the presumption that respondent's determination is incorrect. J. Leonard Schmitz,51 T.C. 306 (1968), affd. sub nom. Throndson v. Commissioner,457 F. 2d 1022 (9th Cir. 1972); Fred Montesi,40 T.C. 511 (1963), affd. 340 F. 2d 97 (6th Cir. 1965). For the first issue, Mid-States' payments on petitioner's note, petitioner presented only his uncorroborated oral testimony to prove his contentions. He presented no other witnesses nor any documents, as for example the alleged option agreement between himself and American. Furthermore, we note that initially petitioner himself accepted the form rather than the alleged substance of Mid-States' payments on his note. Mid-States paid $4,500 on petitioner's note in 1967, which petitioner reported as income, taking a deduction for that portion which constituted *23 interest. In 1968, Mid-States paid $5,500 on petitioner's note; he did not report this amount as income but did take a deduction for interest. In light of the requirement of strong proof, we hold that petitioner has failed to carry his burden. Thus petitioner received additional compensation from Mid-States of $5,500 in 1968 and $1,500 in 1969 and must include these amounts in income. For the second issue, the fair market value of the American stock, petitioner presented almost nothing but his uncorroborated oral testimony. The only documentary evidence is on his 1969 income tax return, Schedule D, which contained the following entry: MIDCENTURY LEASING STOCK EXCHANGED FOR STOCK OF AMERICAN STATES INVESTORS BASIS OF MIDCENTURY LEASING 0 MARKET VALUE OF AMERICAN STATES INVESTORS 0 The market value of zero for the American stock contradicts, however, another part of Schedule D, where petitioner reported the exchange of his Mid-States stock for American stock. Here the value of the American stock is apparently $25,000, the same figure as in the exchange agreement between petitioner and American. Petitioner tries to reconcile the different values by alleging that the zero figure *24 is correct and that he made a "horrible mistake" in reporting the value of the American stock at $25,000. Unfortunately, petitioner never supports his allegation with documentary or other proof. In light of this return, the agreement between petitioner and American stating that the value of the American stock would be not less than $25,000, and the requirement that petitioner present strong proof to overcome respondent's determination, we find that the fair market value of the American stock was $25,000 when petitioner received it in exchange for his Mid-States stock. [4]
The third issue concerns interest deductions. We have held that Mid-States' payments on petitioner's note constituted income. Petitioner accordingly can deduct that portion of those payments which were interest. Mid-States made payments of $5,500 in 1968 and $1,500 in 1969; respondent determined that $2,255.84 and $583.89 of these amounts constituted interest in 1968 and 1969, respectively. Although petitioner deducted $2,800 in 1968 and nothing in 1969 *25 as interest expense relating to his Mid-States stock purchase, he does not now dispute respondent's figures. We therefore hold respondent's determination is correct. In light of concessions by both parties, Decision will be entered under Rule 155.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated. ↩
2. Respondent filed a motion to consolidate petitioner's 1967 taxable year, docket No. 5067-71, with the years before us. Before trial, however, petitioner and respondent agreed upon the amount of petitioner's income taxes for 1967. Thus the motion to consolidate is now moot.↩
3. The record is not entirely clear as to what petitioner means by "controlled." We assume he alleges that Johnston had a controlling interest in the stock of American and because of that interest could cause American to exercise its option.↩
4. Petitioner does not dispute respondent's determination that American's assumption of payments on his note should be a factor in computing his taxable gain.↩