EMMETTE L. BARRAN AND MARTHA BARRAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
C. E. WINTON AND DRUCILLA WINTON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 86667, 86706.   Filed December 12, 1962.

*J. Gilmer Blackburn, Esq.*, for the petitioners.
*William E. McCormick, Esq.*, for the respondent.

---

OPINION.

TURNER, *Judge:* The initial contention of the petitioners raises a question of fact, namely, whether they sold partnership interests to Pet or partnership assets. On brief, they concede that if they sold individual assets, they did not sell partnership interests. It is their position that they sold a going milk business, that such milk business was the only business owned by the partnership, and they therefore sold their partnership interests. They cite and rely on *Hatch's Estate* v. *Commissioner*, 198 F. 2d 26, reversing 14 T.C. 251.

The facts do not support petitioners' contention. The various documents executed by the parties make no reference to a transfer of petitioners' partnership interests to Pet. On the contrary, these documents refer exclusively to the specific assets sold. The preliminary agreement of October 30, 1957, states that it is an agreement "of purchase and sale * * * in reference to the assets of" White Way; that the "Partnership will sell and the Company [Pet] will purchase the following assets: * * *"; that the "delivery of the assets and the acceptance of same by the Company shall be as of mid-night on October 31, 1957"; and that in "consideration of the transfer and delivery of the above enumerated assets free and clear of all encumbrances," Pet agrees to pay and the partnership agrees to accept

$550,000. The instrument is completely devoid of any reference whatsoever to the partnership interests of the petitioners or of any expression of intent to purchase or sell partnership interests.

The documents executed on November 1, 1957, in consummating the purchase and sale, deal with assets and not with partnership interests. According to the bill of sale, petitioners sold, transferred, and delivered to Pet specific assets installed and located at Decatur, Florence, and Boaz, and all other personal properties used in the dairy business, except notes and accounts receivable, but including operating supplies at October 31, 1957, estimated at $10,000. The bill of sale provided for an appraisal of accounts receivable to ascertain whether their value exceeded or was less than the $75,000 at which they were included in the $245,000 purchase price of such assets, after which the purchase price would be adjusted accordingly. The bill of sale further stated that "The sale and transfer of the aforesaid assets shall be effective as of the close of business October 31, 1957." The deed executed November 1, 1957, by petitioners and their wives, transferred the real property therein described to Pet for a stipulated consideration of $230,000. Neither document mentions or refers to petitioners' partnership interests.

The convenants not to compete which were executed by Barran and Winton on November 1, 1957, recite that Pet "has acquired the assets of" White Way, "a partnership composed of" the petitioners, and that Pet "desires and intends to take over the operation of the business of" White Way "and serve the customers thereof." No reference or mention is made in these instruments regarding petitioners' partnership interests.

The fifth document executed on November 1, 1957, in consummating the purchase and sale agreement of October 30, 1957, was a security agreement indemnifying Pet against loss under the warranty contained in the bill of sale. The security agreement specifically states that petitioners, "as members of" a partnership, "entered into a contract of sale with" Pet "whereby they sold and delivered the assets of said partnership and warranted the title thereto to be free and clear of all liens and encumbrances."

And finally on November 1, 1957, petitioners and Pet entered into an escrow agreement, which states that petitioners, as members of the partnership, had "sold and delivered" the assets of the partnership to Pet. Under this escrow agreement Pet paid the sum of $161,163.72 to petitioners' attorney, as escrow agent, who agreed to disburse this sum in the manner therein provided. The sum placed in escrow is described in the agreement as "representing the balance of the purchase price of the assets described in the Bill of Sale."

If we are to give effect to the language used by the parties in the documents consummating the transaction, we must recognize the

parties' only concern was with assets of the partnership. There was a meeting of the minds that the subject matter of the transaction was the purchase and sale of partnership assets. It is only by inference that the transaction can be converted into a transfer of petitioners' partnership interests, and no such inference is justified by this record.

In support of their contention that partnership interests were sold, petitioners point to their testimony that they had no intention of continuing their partnership relation after October 31, 1957. The self-serving nature of this testimony materially weakens its weight as evidence, and it is further weakened by petitioners' testimony that after October 31, 1957, the partnership was actively negotiating with the Atlantic and Pacific Tea Company to construct a store building on partnership land which would then be leased to A&P. Had these negotiations been successful, the partnership may have continued operating indefinitely. Furthermore, there is nothing conclusive in petitioners' argument that partnership interests were transferred, because it had no employees and no income after October 31, 1957. The important fact is that partnership assets were the subject matter of the purchase and sale, not partnership interests.

Our determination here is not in conflict with *Hatch's Estate* v. *Commissioner*, relied on by petitioners. There, the agreement provided for the sale of "all of the business of Hatch Chevrolet Company" to the purchaser. The written agreements herein contain no corresponding provisions. The closest approach thereto appears in the petitioners' covenants not to compete, which state that Pet "desires and intends to take over the operation" of White Way "and serve the customers thereof." But this language must be read in connection with the language that precedes it, namely, that Pet "has acquired the assets of" White Way. When due regard is had for the language used in the agreements between Pet and the petitioners, as the *Hatch* opinion relied on admonishes us to do, we must hold, as we do, that partnership assets were sold, not partnership interests.

Petitioners refer to section 708 of the Internal Revenue Code of 1954 as being consistent with the fact that partnership interests were sold. This section deals with the continuation of a partnership in subsection (a), and the termination of a partnership in subsection (b). The general rule under (a) is that "an existing partnership shall be considered as continuing if it is not terminated." The general rule under (b)(1) is that "For purposes of subsection (a), a partnership shall be considered as terminated only if—

(A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or

(B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.

The above provisions of the 1954 Code and the regulations promulgated thereunder, sec. 1.708–1 (iii), Income Tax Regs., afford no support to petitioners. There was a continuation of their partnership activities after the sale of the bulk of the partnership assets, and at no time was there a sale to Pet or another of any interest in partnership profits. The transaction between the partners in 1958 was a purchase by Barran of Winton's interest in the remaining piece of land owned by the partnership. The date of the dissolution of the partnership and the winding up of its affairs and distribution of its property does not appear of record. Furthermore, the provisions of the 1954 Code referred to by petitioners relate primarily to sales or exchanges of partnership interests, a situation which does not exist here.

In their income tax returns for 1957, each petitioner treated Pet's first $833.33 payment under the covenants not to compete as ordinary income. They now contend that such treatment was erroneous. They claim that they sold a going business including its goodwill. Under their theory the covenants not to compete were incidental to and accompanied the transfer of goodwill primarily for the purpose of assuring the purchaser the beneficial enjoyment of the goodwill acquired. Since the authorities hold that goodwill is a capital asset, *Aaron Michaels*, 12 T.C. 17, and cases cited, petitioners claim that the payments in question are proceeds of sale and hence are capital gains, not ordinary income.

The facts of record do not support petitioners' theory that they in fact sold goodwill. Their dairy business was heavily in debt and they wanted to sell. They negotiated with others as well as Pet. There can be no doubt, therefore, that the negotiations between petitioners and Pet were at arm's length, with each party bargaining for its or his advantage. Petitioners were able to persuade Pet to raise its initial offer from $530,000 to $550,000. The preliminary agreement, the bill of sale, and the deed are specific as to the tangible personal property and the real estate delivered and conveyed for $550,000, plus an adjustment for accounts receivable. Goodwill was not listed among the assets enumerated and transferred to Pet, nor were there specific provisions in such instruments relating to the conveyance of intangible property, which provisions might have encompassed goodwill as one of the assets purchased and sold.

On the contrary, the testimony and the documentary evidence establish that the parties were concerned with, discussed at length, and finally agreed upon the terms and the provisions of the accompanying covenants not to compete. The officials of Pet testified that they would not have purchased the assets without such covenants from the petitioners. Pet was aware of the manner in which petitioners had started White Way and it had no intention of facing a recurrence of

Creamery Company's experience. Furthermore, it was consistent with Pet's practices in acquiring the assets of other dairies to insist upon a covenant not to compete.

Petitioners contend that they sold the dairy business and its goodwill for $750,000, and payment was deferred as to $200,000 thereof. This contention does not square with the facts. Petitioners do not deny that the covenants and the character of the monthly payments thereunder were discussed by the contracting parties, but they do deny any understanding that the covenants provided for anything other than deferred payments of part of the total purchase price. It is apparent, we think, that petitioners' attorney recognized the agreement as a covenant not to compete and sought some modification of its conditions for payment, but Pet rejected the proposal, insisting that petitioners had to comply with their covenants in order to earn the monthly payments. Petitioners alleged lack of understanding as to the purpose and the reasons for the covenants not to compete is at variance with their own action in exacting a 5-year covenant not to compete from Jerry Roden when they purchased his milk business. Furthermore, while the preliminary agreement of sale provided for payment of $200,000 for the covenants, the documents as executed by the parties provide only for payment of $833.33 a month for 120 consecutive months, provided that, at the time each payment became due and payable, petitioners had fully complied with their covenants. It is thus apparent that the purchase price for the assets was $550,000 and the monthly payments were for compliance with the covenants not to compete.

Petitioners claim that on October 31, 1957, they owned a going milk business with existing goodwill, but that after midnight Pet owned such business and its goodwill. They do not claim that goodwill existed because of the earnings of the business, or because of their personal contacts with their customers; rather their claim is based on the fact that they had established customer routes, which they assert are valuable in the same manner as circulation lists of newspapers and customer lists of laundries. They cite *The Pevely Dairy Co.*, 1 B.T.A. 385, as a case involving almost the exact facts as the instant case, except for the fact that it was not the dairy plant that was acquired by Pevely, but the operating routes of two other dairies.

In the *Pevely* case, a purchaser of milk routes deducted their cost as ordinary and necessary expenses. The Commissioner determined that what Pevely actually purchased was goodwill and that the cost thereof should be capitalized. We sustained the Commissioner, pointing out that goodwill was the specific asset sold under one contract and, although not specifically mentioned in the second contract, goodwill was the principal thing of value transferred in the sale of

milk routes by the other dairy. In each contract the consideration for the goodwill transferred was fixed at a certain price per customer. In this case, none of the discussions, negotiations, or written instruments mentioned or referred to goodwill, as an asset involved in the transaction, nor for that matter is there any mention or reference therein to milk routes, customers, customer lists, or trade name. To the contrary, it was the matter of the covenant not to compete that was discussed and bargained for.

Since the facts establish that the covenants not to compete were executed after arm's-length negotiations between the contracting parties, whereby the terms of the convenants and the payments thereunder were fixed and agreed to, we are entitled to assume that the covenants are meaningful. Under such circumstances strong proof must be adduced by the party seeking to overcome his covenant, *Ullman* v. *Commissioner*, 264 F. 2d 305, affirming 29 T.C. 129; *Schulz* v. *Commissioner*, 294 F. 2d 52, affirming 34 T.C. 235, and such proof is lacking in this case. It may be that the petitioners now find themselves at a disadvantage taxwise, but in the absence of fraud it is not ordinarily open to the parties to question their own contractual agreements. *Rogers* v. *United States*, 290 F. 2d 501.

Our next question involves the value and the selling price of White Way's inventory of milk and dairy products at October 31, 1957. The value determined by White Way and the amount included in the lump-sum consideration recited in the bill of sale was $10,000. The parties are agreed that $10,000 is an estimated value for White Way's inventory. After taking a detailed inventory on November 1, 1957, Pet valued the inventory at $19,559.62.[2] In his determination of deficiency, respondent fixed the value of White Way's inventory at $17,-770.49, and increased the partnership's ordinary income by the difference between the $10,000 reported by White Way as income and the $17,770.49 value or selling price as determined by him.

Petitioners now contend that their accountant's failure to take a deduction for a closing inventory does not seem to be in accordance with the provisions of section 1013 of the 1954 Code. Section 1013 deals with the basis of property included in inventory, and provides as follows: "If the property should have been included in the last inventory, the basis shall be the last inventory value thereof." Petitioners claim that even if they sold individual assets instead of partnership interests there would still have to be a closing inventory to ascertain the profit or loss from the partnership's operations from January 1 to October 31, 1957.

---

[2] Respondent states that Pet valued this inventory at $18,719.09. Exhibit U, however, indicates that respondent's figure fails to include the inventory at Florence, valued at $840.53.

We can see no merit to this argument. In the first place, we are of the opinion that White Way's accountant was correct in preparing the partnership's return on a calendar year basis. The partnership did not terminate on October 31, 1957, and it had no closing inventory on December 31, 1957. Furthermore, even if partnership sales are reduced by $10,000, as representing sales of inventory, and the cost of goods sold is similarly reduced by the $10,000, as the valuation of the nonexistent closing inventory, the gross profit will be unchanged.

The principal dispute is over the items inventoried and the amounts thereof and over the pricing procedures and the prices of the various items listed. Our findings show that White Way followed a policy of preparing monthly statements of income using end of the month inventories. Garrett and Manley collaborated in preparing these monthly inventories for White Way. The October 1957 inventory departed from the practice previously followed, in that the pricing of the inventoried items and the extensions were not entered on the inventory sheets until sometime in 1959.[3] Pet, however, took a detailed inventory on November 1, 1957, and valued such milk and dairy products inventory at that time. Both White Way's and Pet's valuations exceeded the $10,000 valuation of inventory in the bill of sale.

A comparison of the inventories of White Way and Pet shows rather startling differences in amounts, principally in raw and bottled sweet milk. White Way's inventory as of October 31, 1957, shows raw milk on hand in the amount of 7,870 pounds; Pet's inventory as of November 1, 1957, the next day, shows raw milk on hand in the amount of 47,867 pounds, or a difference of 39,997 pounds. Similarly, White Way's inventory shows bottled sweet milk in the amount of 2,526 pounds; Pet's inventory shows bottled sweet milk in the amount of 30,053 pounds, a difference of 27,525 pounds. In pricing these two inventory items, White Way and Pet used substantially different values. White Way priced its raw milk at $6.05 per hundredweight, whereas Pet priced raw milk at $3 per cwt. For bottled sweet milk, White Way used a value of $6.28 per cwt., while Pet used a value of $8.99 per cwt.

In their briefs, petitioners list 8 items which they claim were omitted from Pet's inventory and 10 items from Pet's inventory that were omitted from White Way's. Clearly the admission that these 10 items were omitted from White Way's inventory would require an adjustment to the extent of their value. Since the only evidence as to value of those 10 items is the values fixed by Pet, petitioners' inventory valuation would have to be increased in any event by their aggregate value. With respect to the 8 items claimed to have been omitted, it appears

[3] The record does not disclose who priced the October 1957 inventory or when in 1959 such pricing was done. However, the record discloses that deficiencies had been proposed against petitioners by a revenue agent's report dated January 2, 1959, and petitioners' protest was filed March 27, 1959.

that Pet inventoried them as expendable supplies, and not as milk or dairy products. The first 2 of the 8 items are quart and half pint glass bottles numbering 86.24 gross and 43 gross, respectively. In its expendable supplies inventory, glass bottles, Pet inventoried 1,292 dozen quart bottles and 822 dozen half pint bottles, which amount to over 107 gross and 68 gross, respectively. Similarly, under cleaning expense, Pet inventoried cleansers and cleaning compounds using names and with amounts which check out with the other 6 items claimed to have been omitted from Pet's inventory. The treatment to be accorded these 8 items is discussed *infra*.

Petitioners also contend that White Way consistently followed a method of taking inventory as of the end of each month and that because thereof its inventory as of October 31, 1957, should control over Pet's inventory taken after the end of the month. They contend further that they have followed a consistent method in pricing their inventory and that greater weight should be given to such consistency than to any particular method of inventorying or basis of valuation, citing section 1.471–2, Income Tax Regs., which deals with the valuation of inventories. They contend further that any change in method at this time would constitute a change in White Way's method of accounting.

We are not impressed by these arguments. It is clear from the items of inventory discussed above that White Way's inventory failed to list some items, understated the unit count of its raw and bottled sweet milk, and its pricing was done long after October 31, 1957. Other comparisons, which also detract from the reliability of White Way's inventory, are available but need not be recited. Our question is not to decide between the inventories of White Way and Pet, but whether the value determined by the respondent for White Way's inventory represented its selling price to Pet. It was the burden of the petitioners to show that White Way's valuation was correct and that respondent's determination was wrong. This petitioners have failed to do. And, in addition, respondent's affirmative evidence, documentary and oral, definitely supports his determination. We therefore hold that respondent's determination that $17,770.49 of the total purchase price was paid for White Way's inventory of milk and dairy products was proper. It follows that White Way's ordinary income for 1957 was $7,770.49 more than the $10,000 it reported from the sale of its inventory.

Respondent adjusted the long-term capital gain reported by White Way by eliminating $9,171.95 therefrom, after determining that this amount of the total sales price received from Pet represented short-term capital gain realized from the sale of supplies. Pet's detailed in-

ventory classified certain inventory items as expendable supplies, and these classes are set forth in our findings. Included therein are the glass bottles, cleansers, and compounds that White Way included in its inventory of October 31, 1957, which petitioners claimed Pet omitted from its inventory. The expendable supplies as inventoried by Pet not only included the aforementioned classes of items, but it also inventoried various other supplies, including bottle caps, truck parts, and equipment parts, the aggregate value of which was fixed by Pet at $9,870.49.

The parties agree that White Way realized a capital gain from the sale of supplies to Pet; they differ on whether it was a long-term or short-term capital gain. A short-term capital gain is defined as "gain from the sale or exchange of a capital asset held for not more than 6 months." Sec. 1222 (1), 1954 Code. In view of respondent's determination, the burden is on the petitioners to establish that White Way's supplies were held for 6 months or more, if they are to overcome the presumption in favor of respondent's action.

In discussing their burden of proof, petitioners state that the expendable supplies category included 749,109 [4] individual items, and urge that it "would be impossible to set out, with any degree of certainty, the holding period of every individual item." They confess their inability to meet any such burden of proof, and urge that it would be more reasonable to deal with the holding period of the expendable supplies as a group.

Petitioners are in no better position if expendable supplies are considered as a group. They rely mainly on the testimony of Winton to carry their burden. There is nothing definitive in Winton's testimony about the holding period of expendable supplies as a group, or of the specific classes of supplies included therein. We understand from his testimony that some used automobile parts lay around the garage for a considerable length of time, that additional supplies were bought before stocks on hand were exhausted, that new and old stocks were commingled so that it was impossible to tell whether new or old stock was being used, and that it was unnecessary to stock new automobile parts, as local supply houses could quickly supply the partnership needs. Such testimony is too general to establish a holding period for White Way's supplies, and the determination of the respondent is accordingly sustained.

*Decisions will be entered for the respondent.*

---

[4] Pet's inventory of expendable supplies lists 13 different-sized gaskets aggregating over 34,000 units and seven different kinds of bottle caps aggregating 659,000 units as being on hand at November 1, 1957. Such inventory also shows thousands of individual units in the truck and plant repair classifications, as well as 7,184 gallons of gasoline and over 300 quarts of motor oil.