ARTHUR A. BALLANTINE, JR., AND MORLEY C. BALLANTINE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1736-64. Filed May 19, 1966.

*Frederic B. Emigh*, for the petitioners.
*Frederick B. Strothman*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the year 1960 in the amount of $9,267.53. The issues for decision are (1) whether any part of the cash consideration received by petitioners in 1960 from the sale of certain assets of a newspaper they were publishing was paid for a covenant not to compete; (2) whether cancellation of a note in the amount of $250 received by a newspaper-publishing partnership for money advanced to a civic organization for construction of a public golf course gave rise to a deduction of $250 as advertising expense; and (3) whether the partnership may deduct $560 for travel expenses of the partners incurred on a trip on which they wrote articles which allegedly were published in the newspaper published by the partnership.

### FINDINGS OF FACT

The stipulated facts are found as stipulated.

Petitioners are husband and wife residing in Durango, La Plata County, Colo. They filed a joint income tax return for the calendar year 1960 with the district director of internal revenue, Denver, Colo. Petitioner Arthur A. Ballantine, Jr., is a graduate of Harvard College, Yale Law School, practiced law in New York City for about 1 year, worked for the State Department in the Office of Coordinator of Inter-American Affairs, served in the Navy during the war, and worked in Minneapolis in the newspaper business for 6 years prior to 1952.

In 1960 petitioners were equal partners in a partnership called Durango Herald-News which published a newspaper in Durango, Colo., purchased by the partners in 1952. The partnership kept its records and accounts on a fiscal year basis ending September 30. In

connection with the purchase of the newspaper in 1952 petitioners paid a part of the consideration for a covenant from the seller not to compete, which was contained in a separate contract.

On April 17, 1958, petitioners purchased a semiweekly newspaper called the Cortez Sentinel (hereafter referred to as the Sentinel) from the Beaber family. The Sentinel had been owned and published by the Beaber family in Cortez, Montezuma County, Colo., a town about 45 miles west of Durango, since 1928. The purchase was made under a written contract of sale for $75,000. The contract recited that the sellers were selling the newspaper and publishing business known as the Cortez Sentinel, including all tangibles and intangibles used by the sellers directly or indirectly in the conduct of the business, except automotive equipment, all subscription lists and circulation records, and the goodwill and trade name, it being intended to convey the business as a going business, except that the job printing business conducted by the sellers, and certain equipment used therein, was not being sold. The agreement contained a specific agreement from the sellers not to become "interested * * * in the newsgathering, advertising or circulation of any newspaper" in Cortez or within a radius of 100 miles from Cortez for a period of 10 years from May 1, 1958; it also contained an agreement by the buyers not to compete with the sellers in the job printing business in Cortez. No allocation of the purchase price was made in the agreement.

All assets of the Sentinel were contributed by the petitioners to their partnership known as the Durango Herald-News, and allocation of the $75,000 purchase price was made on the books of account of the partnership as follows:

| | |
|---|---|
| Equipment | $33,118 |
| Subscription lists, etc | 2,400 |
| Goodwill | 39,482 |
| Total | 75,000 |

In arriving at this allocation petitioners had all of the tangible assets appraised and deducted the appraised value thereof from the purchase price to arrive at the value allocated to goodwill. The item "Goodwill, $39,482.00" continued to be carried on the partnership books at that figure until the sale which took place on September 29, 1960, hereinafter mentioned.

Petitioners published the Sentinel from April 1958 to September 1960. They sustained a net loss for each of the years as follows:

| | |
|---|---|
| 5 months ended September 30, 1958 | $8,912.65 |
| Year ended September 1959 | 42,982.67 |
| Year ended September 1960 | 43,683.90 |

The paper was published in competition with the Montezuma Valley Journal, another paper published in Cortez semiweekly by the Monte-

zuma Valley Journal, a partnership composed of C. D. Brown and various members of his family, since about 1932. Soon after petitioners purchased the Sentinel they began publishing it on a daily basis. While this increased its share of the national advertising it also resulted in heavier financial losses for the project. Petitioners subsequently resumed publication on a semiweekly basis. This competition also resulted in a decrease in the profit of the Montezuma Valley Journal.

In 1960 petitioners and the Browns began discussions directed toward one of the parties buying out the other. The Browns asked $100,000 for the sale of their business so petitioners decided it would be better to sell. An extended meeting between petitioners, the Browns, and their respective counsel took place on or about September 22, 1960, as a result of which it was agreed that petitioners would sell the Sentinel and certain of its assets to the Montezuma Valley Journal for $30,000. A written contract of sale was thereafter drafted by petitioners' counsel, which was executed by the parties on September 29, 1960, in which the Durango Herald, a partnership composed of petitioners, was the seller, and the Montezuma Valley Journal was the buyer.

The agreement after reciting that sellers owned certain intangible property used in connection with the publication of the Sentinel which the buyers desired to purchase, provided in paragraph 1 that the sellers thereby sold to the buyers—

all of the good will and trade name, Thursday subscription list,[1] newspaper files and the right to publish that certain newspaper located at Cortez, Colorado known as The Cortez Sentinel and all cuts, pictures, mats, engravings, all mailing stencils which do not involve the Sunday subscription lists, stationery, mailing permits, advertising contracts, correspondence business files dealing exclusively with The Cortez Sentinel, advertising sign on the building and logotypes.

It was agreed that none of the furniture, fixtures, machinery, or like tangible assets, except those listed above, were being sold, and sellers should also retain the Sunday subscription list.

Paragraph 2 of the agreement provided that the consideration of the "sale and purchase of said property" is divided into two distinct parts, first a cash consideration of $30,000, and second, the assignment by seller to buyer of all of seller's right, title, and interest in and to the noncompete agreement that the seller purchased from the Beabers under the contract of April 17, 1958, the terms of which were quoted in the agreement.

---

[1] Petitioners were apparently publishing the Sunday edition of the Sentinel as a part of the Durango Herald-News at this time. It is not clear from the record whether the name of this paper was the Durango Herald-News, but the matter is not of controlling significance and we shall hereafter refer to this paper by that name.

Paragraph 5 of the agreement provided that as further consideration for the purchase price paid, the seller and its partners agreed not to become interested in any capacity in the publication of a newspaper in Montezuma or Delores Counties for a period of 10 years, with certain provisos. Paragraph 6 provided that neither the buyer nor any of its partners would become interested in any capacity in the publication of any newspaper in La Plata County for a period of 10 years, with certain provisos. Neither of these paragraphs made any reference to a price to be paid for the noncompete agreements. Provisions were also made in the contract of sale that seller would not sell its newspaper equipment or sublease its offices to anyone without the consent of the buyer, and that seller should have the first right of refusal if buyer should contemplate selling its newspaper business.

Petitioners reported the partnership loss on the sale of the Sentinel on their 1960 return, which loss was computed on the partnership return as follows: $125 of the sales price was allocated to "newspaper files," resulting in a gain of $11.25, and the balance of the sales price, or $29,875, was allocated to "Goodwill and circulation clientele (subscription lists and right of publication) of the Cortez Sentinel newspaper." This was deducted from a cost basis of $41,882,[2] resulting in a loss, after deducting costs of sale of $357, in the amount of $12,364. Petitioners reported this amount as a long-term capital loss on their return, offsetting it against long-term capital gains reported on the return.

In his notice of deficiency respondent determined that $27,475 of the $30,000 proceeds of sale of the Cortez Sentinel was received as payment for noncompetition agreements, thereby increasing petitioners' ordinary income by that amount and increasing the capital loss reported by a like amount.

About 1954 petitioners' partnership, together with other local people, "put up $250 apiece" to build a municipal golf course on land owned by the City of Durango. Later when the "club" was still having financial difficulties petitioners and others decided to make a contribution of the amount they had put in for the welfare of the club because they thought it was desirable for Durango to have the golf course as a tourist attraction. The partnership deducted $250 as "promotional advertising" expense on its return for the fiscal year 1960. Respondent disallowed the deduction.

In 1960 petitioners took a trip to the island of Antigua. From there they took a 2-week trip to Venezuela, Colombia, Panama, and Costa Rica. While on this trip they wrote foreign affairs editorials for their newspaper from research and information gleaned on this trip.

---

[2] This was apparently arrived at by deducting the cost of tangible assets retained from the total price paid for the Sentinel. Respondent has not questioned this basis.

The trip from Antigua cost them $1,613. Petitioners and their accountant computed that about 40 percent of their expenses on this trip was allocable to the work done for the newspaper. Instead of charging 40 percent of this expense, or $645, to the newspaper for this work, petitioners charged $560, computed at $2 per inch for the material printed. The partnership deducted this amount on its return for its fiscal year 1960 as "Special editorial travel." Respondent disallowed the deduction and increased petitioners' taxable income from the partnership accordingly.

OPINION

The principal issue is whether any part of the $30,000 cash consideration received by petitioners' partnership for the sale of the Cortez Sentinel should be allocated to a covenant or covenants not to compete and taxed to petitioners as ordinary income rather than capital gain. Respondent determined that $27,475 of this amount "was received as payment for non-competition agreements." The notice of deficiency and the record are both silent as to how respondent arrived at this amount, despite the curiosity expressed by the Court with respect thereto when counsel for respondent made his opening statement.

It is well settled that payments received by a taxpayer for his covenant not to compete are taxable as ordinary income. *Beals' Estate* v. *Commissioner*, 82 F. 2d 268, affirming 31 B.T.A. 966; *Rodney B. Horton*, 13 T.C. 143. This is so because compensation received for refraining from labor is income no less than compensation for services to be performed. *Salvage* v. *Commissioner*, 76 F. 2d 112. However, where a covenant not to compete is given in connection with the sale of a business, including goodwill, it must be determined whether the covenant is severable from the goodwill and was actually bargained for as a separate item, and if so how much of the consideration paid was actually paid for the covenant not to compete. As was said in *Rodney B. Horton, supra:*

> It is well settled that if, in an agreement of the kind we have here, the covenant not to compete can be segregated in order to be assured that a separate item has actually been dealt with, then so much as is paid for the covenant not to compete is ordinary income and not income from the sale of a capital asset. *Estate of Mildred K. Hyde*, 42 B.T.A. 738. On the other hand, where the covenant not to compete accompanies the transfer of good will in the sale of a going concern and it is apparent that the covenant not to compete has the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which has been acquired, the covenant is regarded as nonseverable and as being in effect a contributing element of the assets transferred. *Toledo Newspaper Co.*, 2 T.C. 794; *Toledo Blade Co.*, 11 T.C. 1079; *Aaron Michaels*, * * * [12 T.C. 17].

Considerable weight will be given to the written agreement of the parties as to whether a covenant has actually been dealt with as a separate item in the transaction and, if so, how much was paid for it, *Benjamin Levinson*, 45 T.C. 380; *Ullman* v. *Commissioner*, 264 F. 2d 305, affirming 29 T.C. 129; but the courts are not bound by the terms of the written agreement and may look to the actual facts to determine what was involved. *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761, affirming 19 T.C. 718; *Carl L. Danielson*, 44 T.C. 549, on appeal (C.A. 3, Dec. 21, 1965).

There is no allocation of the purchase price in the contract of sale between the purchasers and sellers. The evidence indicates that the document was carefully drawn by petitioners' attorney after protracted negotiations between the parties; and the Browns' attorney testified that the document as written correctly reflected the agreement between the parties. We therefore conclude that there was no intention on the part of either of the parties to make a specific allocation of any part of the purchase price to the covenants not to compete. However, this does not conclusively establish that no part of the purchase price was actually paid for the covenants.

The format of the contract of sale supports petitioners' argument that none of the cash consideration was given for petitioners' covenant not to compete. Paragraph 1 sets out and describes the property being transferred, and it does not mention petitioners' covenant. In paragraph 2 immediately following it is stated that the "consideration of the sale and purchase of *said* property" (emphasis added) is divided into two parts which are: (a) $30,000 in cash, and (b) assignment of the Beabers' covenant not to engage in the newspaper business in the Cortez area for 10 years. Still no reference is made to petitioners' covenant. It is not until we reach paragraph 5 that we find any reference to petitioners' covenant. Paragraph 5 provides that as "further consideration for the purchase price paid under this contract" the sellers agree not to engage in the publication of a newspaper in Montezuma or Delores Counties for 10 years. This is followed by paragraph 6 which states that "It is further agreed by the Buyer" that the buying partners will not engage in publication of a newspaper in La Plata County (wherein Durango is located and petitioners were publishing the Durango Herald-News) for a period of 10 years. No monetary consideration is mentioned in either of the latter paragraphs. It would appear from the positions of the various provisions in this document itself that the cash consideration was in reality paid for the items specified in paragraph 1 and for the assignment of the Beabers' covenant; and that the covenants of the sellers and the buyers were offsetting considerations. We think some weight should be given to this factor in the light of the fact that petitioners and their counsel

were cognizant of and concerned with the tax implication of a covenant not to compete given by petitioners.

It would also appear that covenants not to compete from both the Beabers and petitioners were considered necessary by the buyers to assure themselves of realizing the full value of the goodwill, trade name, circulation lists, etc., that they were acquiring, and that this was the primary function of the covenants. Respondent argues that because of the poor earnings record of petitioners with the Sentinel there was no goodwill attached to the business. While the value of goodwill is often sought from consideration of excess earnings, and goodwill is often used in that context, certainly goodwill may arise from something other than excess earnings. This should be particularly true in the newspaper business. See *Toledo Newspaper Co.*, 2 T.C. 794. It has been said that goodwill is nothing more than the probability that the old customers will resort to the old place. See 18 A, Words and Phrases (1965 cum. supp., p. 20) ; *Rodney B. Horton, supra*. The assets purchased by the buyers in this case were acquired primarily to produce such a result. We doubt that the value of the goodwill, trade name, and circulation lists of the Sentinel was reduced by the fact that the paper lost money while petitioners operated it or that the losses resulted from a lack of value in those assets. The buyer immediately put these assets to use and C. D. Brown testified that they were of value to the buyer's business. We think there was considerable value in the specific items sold and that petitioners' covenant not to compete was a nonseverable contributing element to the value of those assets.

Brown testified that one of the principal reasons for his purchase of the Sentinel was to get petitioners out of the newspaper business in Cortez and to keep the Beabers from getting back into it. We think the latter part of the stated reason points up the fallacy in respondent's position on this issue. The evidence indicates that the Browns were probably more fearful of competition from the Beabers, who had been in the newspaper business in Cortez for many years, than from petitioners, who were newcomers to the area. Respondent argues on brief that any amount received by petitioners that was allocable to the assignment of petitioners' right, title, and interest in the Beaber covenant is taxable as ordinary income to petitioners. In support of this argument respondent cites *Beals' Estate v. Commissioner, supra; Salvage v. Commissioner, supra; Yost v. Commissioner*, 155 F. 2d 121; and *Emmette L. Barran*, 39 T.C. 515. None of these cases are apposite or support respondent's argument. They all involve payments to the taxpayers for their own agreements not to compete. They do not involve payments to taxpayers for assignment of someone else's covenant not to compete.

Petitioners' interest in the Beaber covenant was clearly a capital asset in the hands of petitioners. If it was severable from the goodwill they acquired along with it, the cost thereof could be amortized over the period thereof; if not, it is considered a part of goodwill and is not amortizable. *B. T. Babbitt, Inc.*, 32 B.T.A. 693; *Toledo Blade Co.*, 11 T.C. 1079, aff'd. 180 F. 2d 357. But this makes it no less a capital asset. See *Aaron Michaels*, 12 T.C. 17. Petitioners did not allocate any part of their purchase price of the Sentinel to the covenant, but set it up on their books as a part of goodwill, which nobody has questioned so far as we know. If any part of the consideration paid by the buyer to the petitioners in the transaction before us was actually separately allocable to the Beaber covenant it was payment for a capital asset. We have been offered no theory upon which it could be likened to payment of compensation to petitioners for not engaging in business, see *Salvage* v. *Commissioner*, *supra*, or for anything else that would make it taxable as ordinary income to petitioners.

We hold for petitioners on this issue.

The second issue is whether petitioners' partnership was entitled to deduct as advertising expense $250 allegedly contributed for construction of a municipal golf course in Durango. Petitioners have failed to carry their burden of proof on this issue and we hold for respondent. There is simply not enough evidence in the record for us to know just what organization the money was given to, what its function was, whether the contribution was made in 1960 or at some other time, or how it was related to the business of the partnership.

The third and final issue is whether petitioners' partnership was entitled to deduct $560 of the cost of a trip taken by petitioners during which they allegedly sent back articles or editorials which were printed in the Durango Herald-News. Petitioners claim that the value of the material furnished to the newspaper was enhanced by their journey because readers were impressed with the fact that petitioners were writing from first-hand experience. Here again the record is woefully inadequate for us to determine whether this was an ordinary and necessary expense of the partnership business. There is no evidence of how much material was received or used by the newspaper or how it was used. It is not at all clear just how the item got on to the partnership books. Petitioners did not report any income from writing. We assume that the partnership paid the expenses of the trip and charged this part of the cost to a "Special editorial travel" expense account and charged the rest of it to the partners' capital accounts; but there is little evidence to support even this assumption. Respondent's regulation, sec. 1.162–2(b)(1), Income Tax Regs., provides as follows:

If a taxpayer travels to a destination and while at such destination engages in both business and personal activities, traveling expenses to and from such

destination are deductible only if the trip is related primarily to the taxpayer's trade or business. If the trip is primarily personal in nature, the traveling expenses to and from the destination are not deductible even though the taxpayer engages in business activities while at such destination. * * *

Without considering the validity of this regulation one way or the other, we do think it points up factors that must be considered in determining this issue, and the record does not provide us with enough evidence with respect to these factors to make an affirmative determination that these expenses were related to the partnership business. A review of all of Arthur Ballantine's testimony on this subject leaves us with the impression that whatever knowledge and information he acquired as a result of this trip was more a personal satisfaction to him than a benefit to the newspaper. Compare *Kerns Wright*, 31 T.C. 1264, affirmed per curiam 274 F. 2d 883.

We conclude that petitioners have failed to carry their burden of proof on this issue and we hold for respondent on the issue.

*Decision will be entered under Rule 50.*