Tobe C. and Julie Deutschmann v. Commissioner.
Deutschmann v. Commissioner
Docket No. 1272-65.
United States Tax Court
T.C. Memo 1966-229; 1966 Tax Ct. Memo LEXIS 55; 25 T.C.M. (CCH) 1188; T.C.M. (RIA) 66229; October 19, 1966
*55 Capital gains v. ordinary income: Employment contract: Covenant not to compete: Sales of capital stock. - The taxpayer transferred a majority interest in his corporation to the C corporation and entered into a covenant not to compete and consultation agreement with C, receiving certain payments from C. Held: the agreement was no sham. The payments were received by the taxpayer for his covenant not to compete and his availability for consulting services, even though he performed no services. Accordingly, the payments are taxable as ordinary income and not at capital gains rates. Additions to tax: Failure to file: Reasonable cause: Absence of proof. - For failing to mention or to prove alleged "reasonable cause" for not filing timely income tax returns, the taxpayers are subject to the additions to tax under Code Sec. 6551(a) as determined by the Commissioner. Daniel D. Levenson, for the petitioners. James E. Markham, Jr., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following income tax deficiencies and additions to tax: Addition to Tax
Year
Deficiency
(Sec. 6651(a))
1957
$ 250.75
1958
620.33
1959
33,725.22
$7,584.09
1960
13,042.48
2,608.50 The deficiencies for 1957 and 1958 are attributable to the disallowance of the 1960 net operating loss tentatively allowed as carrybacks to 1957 and 1958. The primary issue presented for decision is whether payments made by Cornell-Dubilier Electric Corporation to Tobe Deutschmann in 1959 and 1960 were solely for an employment contract and covenant not to compete, and thus taxable as ordinary income, or whether they represented capital gains as consideration for the sale of capital stock or its equivalent in the Tobe Deutschmann Corporation. A second issue is whether the petitioners are liable for the addition to tax imposed by section 6651(a), Internal Revenue Code of 1954, because of their failure to file timely *57 joint Federal income tax returns for 1959 and 1960. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Tobe C. Deutschmann (hereafter called petitioner) and Julie Deutschmann are husband and wife residing in Canton, Massachusetts. They filed their joint Federal income tax returns for the years 1957 through 1960 with the district director of internal revenue at Boston, Massachusetts. The income tax returns for the taxable years 1959 and 1960 were not filed within the time prescribed by law and were not received by the district director of internal revenue at Boston until July 27, 1961. The Tobe Deutschmann Corporation (hereafter called Deutschmann Corporation) was incorporated in Delaware in 1929 and was actively engaged in the research and manufacture of capacitors. It was the first company to make commercial energy storage capacitors. In the mid-1950's, Deutschmann Corporation determined that for expansion it would be necessary to obtain financial support from a large company. It was in financial difficulty as shown by its earned deficit of $518,000 in September 1956. *58 Therefore, it entered into negotiations with Cornell-Dubilier Electric Corporation (hereafter called Cornell), a Delaware corporation. Cornell originally wanted to buy 100 percent of Deutschmann Corporation, but petitioner wanted to keep a minority interest, believing such interest would increase in value. A memorandum agreement was executed on September 14, 1956, whereby there was a capital reorganization of Deutschmann Corporation which left Cornell as the controlling stockholder. Under such agreement Cornell was to receive about 70 percent of the common stock of Deutschmann Corporation, purchase its fixed assets and lease them back, and loan Deutschmann Corporation specified sums of money. This agreement provided, in part, as follows: (v) Cornell and Tobe [petitioner] shall have entered into an Employment Contract referred to in subparagraph d. of Paragraph 5 above, provided, however, that if Cornell waives compliance with this condition (which it does not propose to do unless unforeseen circumstances arise which force it to do so), Tobe hereby expressly agrees that from and after the Closing, he will not, unless acting as an officer or director of the Company [Deutschmann *59 Corporation] or with Cornell's prior written consent, directly or indirectly own, manage, operate, join, control or participate in the ownership, management, operation or control of, or be connected as an officer, employee, partner, or otherwise with, any business under any name similar to the Company's name and that for a period of 2 years after the Closing will not in any manner, directly or indirectly, compete with or become interested in any competitor of the Company throughout the United States. Tobe further agrees that the remedy at law for any breach by him of the foregoing will be inadequate and that the Company and Cornell shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage to the Company or Cornell; On October 16, 1956, the above-mentioned Employment Contract was executed. It provided for the petitioner's employment as general sales manager of Deutschmann Corporation for five years and contained, inter alia, the following provisions: 3. * * * Tobe shall devote his entire time, attention and best efforts to the business of the Company and shall not, directly or indirectly, engage or be employed in any other business *60 which in any manner competes with that of the Company. * * *
6. During the period from the date hereof to October 16, 1961, Tobe will not, unless acting as an officer or director of the Company or with the prior written consent of the Board of Directors of the Company, directly or indirectly, control, own, manage, operate, join or participate in the ownership, management, operation or control of or be connected as an officer, employee, partner or otherwise, with any business under any name similar to the Company's name and that during said period Tobe will not in any manner, directly or indirectly, compete with or become interested in any competitor of the Company throughout the United States or any foreign country. Tobe further agrees that the remedy at law for any breach by him of the foregoing covenant will be inadequate and that the Company shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage to the Company. In October 1956, after the completion of this transaction, petitioner owned approximately 16 percent of the common stock and approximately 75 percent of the preferred stock of Deutschmann Corporation. The preferred *61 stock was deposited in a voting trust, the trustees of which were Octave Blake, president of Cornell, Haim Beyer, vice president of Cornell, and Peter L. Keane. Under an Option and Put Agreement executed on October 16, 1956, Cornell had the right under some circumstances, and the obligation under others, to purchase all of petitioner's shares, the purchase price to be determined by a formula based on both earnings and net worth. Cornell, at the time it acquired the controlling interest of Deutschmann Corporation and for a time thereafter, expected to make Deutschmann Corporation into a profitable subsidiary. In the spring of 1959, a Boston lawyer the petitioner had employed, and to whom he had communicated his complaints against Cornell, began preparations for instituting a minority shareholder's suit against Cornell. He later recommended that petitioner employ more experienced counsel to handle the litigation. Petitioner employed the second attorney but never took legal action against Cornell for the alleged mismanagement of the Deutschmann Corporation. During the summer of 1959 Federal Pacific Electric Company (hereafter called Federal) acquired the controlling interest in *62 Cornell. On August 21, 1959, petitioner, his attorney, and his accountant went to the offices of Federal in Newark, New Jersey. Petitioner stated his intent to initiate an action against Cornell to protect his interests. Also discussed was the possible termination of operations at the Deutschmann Corporation. At that time Deutschmann Corporation was insolvent and had an indebtedness to Cornell in excess of $2,000,000. On September 12, 1959, the operations of Deutschmann Corporation were terminated. Then on September 15, 1959, petitioner, accompanied by his attorney and accountant, again met with the principals of Federal and Cornell. At such meeting it was proposed that petitioner sign an agreement whereby he would become a consultant to Cornell. On September 17, 1959, petitioner and Cornell signed a contract whereby petitioner agreed to become a consultant to Cornell and not to compete with Cornell in certain areas for a period of five years. Payments were to be received by petitioner over such five-year period. The agreement provided: WITNESSETH: WHEREAS, Mr. Deutschmann has had many years of experience in the capacitor industry and in related fields; and WHEREAS, Mr. *63 Deutschmann is about to embark upon the business of an independent consultant in the capacitor industry and related fields; and WHEREAS, C-D is desirous to retain the services of Mr. Deutschmann and to assure to the extent herein specifically set forth that Mr. Deutschmann, who previously had been employed by a subsidiary of C-D, will not consult companies manufacturing products now manufactured by C-D or assist in the promotion of products of any such competitors. NOW, THEREFORE, in consideration of the premises and mutual covenants hereinafter contained and other good and valuable consideration, the receipt whereof is hereby acknowledged, the parties hereto agree as follows: 1. This contract covers the period of five years ending September 30, 1964. 2. C-D hereby retains Mr. Deutschmann as a consultant to advise and consult in matters for which Mr. Deutschmann's experience and talents have qualified him with the principal executive officers of C-D at such times and places as they may reasonably request. Such consultations, however, will be so arranged so as not to interfere with Mr. Deutschmann's other commitments and activities in the consultative field, or activities and *64 commitments in any other business in which he may be interested. 3. Mr. Deutschmann and C-D acknowledge that they will cooperate for the furtherance of their mutual interests (but it is expressly understood that the legal obligations of the parties are only those set forth in the other paragraphs of this agreement and this paragraph is not intended to create any additional obligations on the part of either party). 4. During the term of this contract, Mr. Deutschmann will not: (a) participate as a principal stockholder, partner, or proprietor of, or become an employee of or consultant to any person, firm or corporation whose principal place of business is in the United States for the purpose of assisting in the design or manufacture of products which will compete with products now or at any time in the past five years manufactured and commercially sold or in the process of being tested and perfected with a view to commercial sale by C-D or its subsidiaries, where such products are manufactured for sale, provided that Mr. Deutschmann may participate as a principal stockholder, be employed by or render service to a person, firm or corporation manufacturing such products for its *65 own use, and that a manufacturer shall not be deemed to be manufacturing a product competing with any product manufactured by C-D or its subsidiaries merely because one or more of the component parts of the manufacturer's product consists of an item or items of the same kind as that manufactured by C-D, or any subsidiary of C-D if the product as offered for sale by the manufacturer has not been manufactured or offered for sale by C-D or any subsidiary of C-D in substantially the same form: or (b) participate as a principal stockholder, partner, or proprietor or become an employee of or consultant to any person, firm or corporation in the United States which manufactures or intends to manufacture a product or products for sale in competition with products now or at any time in the past five years manufactured and commercially sold, or in the process of being tested and perfected with a view to commercial sale within a reasonable period from the date hereof and actually sold within such period by C-D or any of its subsidiaries for the purpose of promoting the sale of such competing product or products. The proviso clause in subparagraph (a) will also be applicable to this subparagraph *66 (b). It is specifically understood, anything to the contrary notwithstanding, that Mr. Deutschmann is in no way to be restricted by any of the terms of this agreement with regard to activities of any kind for and on behalf of foreign corporations owned or controlled by interests originating outside of the United States, and their subsidiaries whether or not organized in the United States (but no services shall be rendered directly to any United States subsidiary or branch of a foreign corporation), but is not to render services to a corporation organized in a foreign country if owned or controlled by an affiliate which manufactures such products within the United States. It is understood that except as herein provided, it is the intention hereof that Mr. Deutschmann shall in no way be restricted from any activities in connection with the promotion or sale of products elsewhere than the United States. 5. In consideration for Mr. Deutschmann's commitment to be available as a consultant to C-D hereunder and to refrain competing with C-D or its subsidiaries in the manner set forth in paragraph 4 hereof, C-D undertakes to pay to Mr. Deutschmann, or to his estate if he should die prior *67 to the date upon which any of such sums become payable, compensation, payable yearly in advance, as set forth below, and such sums shall be payable notwithstanding any inability at any time on the part of Mr. Deutschmann to perform any services hereunder, it being understood that C-D's obligation to make such payments shall terminate only in the event of a breach by Mr. Deutschmann of the terms of paragraph 4 hereof, and in such event shall be subject to termination only in the manner hereafter provided. For the 12 months ending September 30, 1960, $50,000 For the 12 months ending September 30, 1961, $50,000 For the 12 months ending September 30, 1962, $35,000 For the 12 months ending September 30, 1963, $25,000 For the 12 months ending September 30, 1964, $15,000 Any failure by C-D to make any of the payments when due, except because of the breach by Mr. Deutschmann of the terms of paragraph 4 hereof, shall vest in Mr. Deutschmann and his estate the absolute right without any further condition or qualification to receive as "liquidated damages" the payment of said sums at the rate specified. In the event of any claim by C-D of any breach by Mr. Deutschmann of his agreement, *68 payments shall nevertheless be made hereunder in the manner heretofore specified except as otherwise authorized by the following provisions: C-D shall give written notice to Mr. Deutschmann setting forth in detail the specific breach or breaches complained of and requesting that Mr. Deutschmann discontinue the services constituting such breach. If within thirty days after receipt of such notice, Mr. Deutschmann does not in writing give notice to C-D that he will forthwith cease and desist from the services alleged to constitute such breach, the controversy of the parties shall be submitted to arbitration by the American Arbitration Association. Judgment on any award being entered in any court of the State of New York or the Commonwealth of Massachusetts having jurisdiction shall be conclusive and binding on the parties. No termination of the payments otherwise to be made to Mr. Deutschmann hereunder shall be made unless following a determination that the services complained of constitute a breach of this agreement, Mr. Deutschmann has refused and neglected for the period of thirty days thereafter to cease and discontinue such services. If Mr. Deutschmann's covenant not to compete *69 shall be held invalid in a court of law, C-D's obligation to make payments hereunder shall remain in full force and effect and this shall not constitute a failure of consideration therefor. 6. In addition, Mr. Deutschmann will be reimbursed for reasonable travel expenses in the event he is called upon to perform any duties hereunder which necessitate his travel from his home in Canton, Massachusetts. 7. It is understood that Mr. Deutschmann will have the right to use his surname and/or Christian name alone or in combination with any other names in connection with the sale of electronic equipment in countries outside of the United States, and C-D will take any action which may be necessary in order to confirm or establish Mr. Deutschmann's right to register any trademark or marks involving such use in foreign countries. This shall not imply any restriction upon the use by Mr. Deutschmann of any name to which he has a legal right. On the same date several other documents were signed by petitioner, Deutschmann Corporation and Cornell. "In consideration of various agreements entered into by you (petitioner) and the undersigned (Cornell) on or about the date hereof," Cornell transferred *70 to petitioner an automobile, office furniture, and a life insurance policy, the total value of these items being $23,100. "In consideration of one dollar and other valuable consideration," Deutschmann Corporation agreed to release petitioner from any debts, covenants, or actions against him, the only exception being with regard to certain patent rights. This released petitioner from his personal liability on promissory notes given by Deutschmann Corporation to Cornell which petitioner had endorsed. Petitioner also gave his consent to the vote of the voting trustees of his personal stock with regard to certain proposals involving the acquisition by Cornell of certain assets of Deutschmann Corporation. Finally, petitioner signed an instrument which reads: As the record and/or beneficial owner of certain shares of common and preferred stock of Tobe Deutschmann Corporation, I hereby agree that I will interpose no objection as such stockholder to any action which you may take as a creditor and/or stockholder of Tobe Deutschmann Corporation relating to the affairs of that corporation. The payments to petitioner were not made for his stock. He retained the right to sell such stock to *71 a willing buyer or to receive dividends. However, corporate operations ceased as of September 12, 1959; and, based on the books of account, petitioner's stock interest in the Deutschmann Corporation had no value on that date. At the time of the September 17, 1959, agreement, Cornell paid petitioner $50,000 in cash plus $23,100 worth of assets, or a total of $73,100. The second $50,000 installment was paid by September 30, 1960. On September 18, 1961, Cornell notified petitioner that it was discontinuing all further payments to him under the agreement. Petitioner was never called upon by Cornell to give it advice under the consultation agreement. A prospective employer of petitioner was reluctant to hire petitioner until he knew the restrictions placed upon petitioner by the September 17, 1959, consultation agreement and covenant not to compete with Cornell. With this in mind, petitioner sought reformation of that contract. Petitioner brought suit against Cornell in the United States District Court for the District of Massachusetts seeking reformation of the contract of September 17, 1959. He claimed that the parties intended the contract to provide that Cornell could proceed *72 only by arbitration against petitioner, not by other legal or equitable means. Cornell counterclaimed alleging a breach by petitioner of the covenant not to compete. Petitioner then amended his original complaint to include a suit for the balance of $75,000 remaining to be paid under the contract. This action was divided into two parts by agreement of the parties, i.e., the amounts owed under the contract by Cornell to petitioner and the amounts owed by petitioner to Cornell f6r violating the covenant not to compete. The District Court held that Cornell owed petitioner the remaining $75,000. Before there was action as to the amounts owed by petitioner to Cornell as to the second part of the action, the parties agreed to a settlement of $38,500 owed by Cornell to petitioner on the combined claim and counterclaim. Albert Shore, a stockholder in Deutschmann Corporation, brought a stockholder's action against Cornell and others which alleged, in part, a conspiracy to violate the antitrust laws and mismanagement of Deutschmann Corporation. A settlement payment of $3,500 was made either to Shore or his attorney. No liquidation payments or dividends were made to any stockholders of *73 Deutschmann Corporation in 1959 or subsequent thereto for their stock or stock interests. Cornell was indicted for violation of the Sherman Antitrust Act. It pleaded nolo contendere to the indictment and in February 1961 was fined $20,000. Ultimate Finding Petitioner received payments in the amounts of $73,100 in 1959 and $50,000 in 1960 for his covenant not to compete and his availability for consulting services. Opinion Petitioner contends that the allocation of consideration to the consultation agreement and covenant not to compete does not accurately reflect the substance of his contract with Cornell. He maintains that there was not just one contract, but several separate agreements which were all part of an integrated transaction; and that the consideration was wrongfully stated in only one of them in order to serve the tax advantage of Cornell. He also maintains that the consultation agreement was a complete sham, that there was no real intent by Cornell to enforce the covenant not to compete, and that his release of the right to interpose any objections to actions by Cornell with respect to the Deutschmann Corporation was the equivalent of the sale or exchange of *74 a capital asset. Consequently, it is his position that of the $198,100 which Cornell contracted to pay him, the Court should allocate a portion to the sale of his interest in the stock or its equivalent in the Deutschmann Corporation. Respondent counters with the contention that the payments received by petitioner in 1959 and 1960 were compensation for his covenant not to compete and his availability for consulting services. He argues that the contract between petitioner and Cornell was clear on its face and that petitioner has not presented sufficient reason to go behind it. It is axiomatic that the form of a written agreement does not necessarily dictate the substance of the transaction. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); and Gregory v. Helvering, 293 U.S. 465 (1935). However, the parties agree that where a covenant not to compete is specifically set out and given an assigned value, strong proof must be adduced in order to overcome that declaration. See Ullman v. Commissioner, 264 F. 2d 305, 308 (C.A. 2, 1959), affirming *75 29 T.C. 129 (1957); Rogers v. United States, 290 F. 2d 501 (C.A. 9, 1961); Hamlin's Trust v. Commissioner, 209 F. 2d 761 (C.A. 10, 1954), affirming 19 T.C. 718 (1953); Fred Montesi, 40 T.C. 511 (1963), affd. 340 F. 2d 97 (C.A. 6, 1965); Emmette L. Barran, 39 T.C. 515 (1962), affd. 334 F. 2d 58 (C.A. 5, 1964); and Carl L. Danielson, 44 T.C. 549 (1965), on appeal (C.A. 3, Dec. 21, 1965). Careful consideration of this record persuades us that the petitioner has not presented the "strong proof" necessary to overcome the clear language of the covenant not to compete and the consultation agreement. Thus, in our opinion, the petitioner cannot escape the tax consequences stemming therefrom. There are several reasons for reaching this conclusion. One standard for determining if a covenant not to compete should be enforced is whether it has "some independent basis in fact or some arguable relationship with business reality." See Schulz v. Commissioner, 294 F. 2d 52, 55 (C.A. 9, 1961), affirming 34 T.C. 235 (1960); Balthrope v. Commissioner, 356 F. 2d 28 *76 (C.A. 5, 1966); Hamlin's Trust v. Commissioner, supra; and Benjamin Levinson, 45 T.C. 380 (1966). Petitioner is skilled and respected in the area of developing and manufacturing capacitors. He was the president and controlling stockholder of the Deutschmann Corporation from its incorporation until its sale to Cornell in 1956. Cornell thought highly of him at the time it acquired the Deutschmann Corporation. He signed a covenant not to compete when the acquisition took place. He had intimate knowledge of the research and production processes of both Deutschmann Corporation and Cornell in the manufacture of capacitors. Furthermore, petitioner has not shown that the covenant not to compete was meaningless because of age, illness or pursuit of another interest. And he admits on brief that he intended to start his own laboratory shortly after the agreement was signed. These facts demonstrate to our satisfaction that the petitioner was a potential competitive threat to Cornell and that the covenant not to compete had economic reality. Still another reason for considering the covenant not to compete valuable was the desire of Cornell to retain key personnel of *77 the Deutschmann Corporation who remained in Cornell's employment. Similarly, the consultation agreement had a "relationship with business reality," even though petitioner asserts that it was a complete sham and was procured by Cornell solely to insure the deductibility of its payments under the terms of the agreement. In attempting to show that the agreement was a sham, petitioner points to the open hostility which existed between himself and Cornell when the consultation agreement was executed. He also points to the fact that he was never called upon to render consulting services and any consulting services would have to have been arranged so as not to interfere with his other activities. The arrangement, however, was not intended to insure petitioner's specific consultation services, only his availability for them. It appears that Cornell wanted petitioner available to help procure contracts with certain Government agencies; and, while the need for his services in this narrow area never arose, Cornell intended to take advantage of them if needed. Moreover, the "open hostility" that existed between the contracting parties and their competing tax interests created an antithetical *78 atmosphere which no doubt compelled them to agree upon terms and conditions that reflected their true intent. Ullman v. Commissioner, supra.
Courts have been hesitant to look behind a contract produced by genuine arm's-length bargaining. See Montesi v. Commissioner, supra; Ullman v. Commissioner, supra; and Benjamin Levinson, supra.Looking at the facts of this case, we see that the petitioner was in constant correspondence with counsel from 1956 until 1959 with respect to the possibility of a minority stockholder's suit against Cornell. More important, petitioner was accompanied by his attorney and his accountant at both the August 21, 1959, and September 15, 1959, meetings with Cornell and Federal. Since petitioner's consultation services and the covenant not to compete were discussed and the documents apparently drafted at these meetings, it is clear that he had adequate legal and financial advice throughout the negotiations. Petitioner also possessed the acumen and knowledge of an experienced businessman. Whether or not the petitioner was *79 aware of the tax consequences, which resulted from characterizing the payments as consideration for a consultation agreement and a covenant not to compete, is not controlling. Where, as here, the parties are represented by competent counsel who comprehend the substance of the transaction, they are bound by the tax consequences flowing therefrom. Balthrope v. Commissioner, supra; Yandell v. United States, 315 F. 2d 141 (C.A. 9, 1963); Hamlin's Trust v. Commissioner, supra.Petitioner cannot have his agreement with Cornell reformed simply because the payments are taxable to him as ordinary income instead of capital gain. The tax advantages and consequences are a factor to be bargained for by the parties in setting a price; and the failure of one party, having knowledgeable counsel, to provide for his own tax advantage is not a sufficient basis for upsetting the entire contract. Cf. Schulz v. Commissioner, supra. Petitioner stresses several points in an effort to show that the parties never intended to enforce the covenant not to compete, although the covenant was otherwise based on business reality and evolved out of arm's-length *80 negotiations. He notes that the balance of the payments was to be continued even if the covenant should be found invalid by a court, that payments were to be made in advance for each 12-month period, and that they were to continue for a specified period even if Cornell claimed a breach in the agreement. But since the agreement created an enforceable and meaningful covenant not to compete, the provisions which would otherwise appear to undermine it seem immaterial. Benjamin Levinson, supra; and Eitingon-Schild Co. and Subsidiaries, 21 B.T.A. 1163 (1931). Petitioner claims that the parties intended arbitration to be the only remedy available to Cornell in the event of a breach of his covenant and that injunctive relief and damages were erroneously included as remedies to Cornell. While certain correspondence is relied on by petitioner to support his insistence on reformation of the contract, we deem it insufficient to carry his burden of proof in light of the plain language of the agreement, the denial of any error by Cornell, and his failure to obtain a court determination on the issue. And, even if we assume that arbitration was the only remedy intended *81 under the agreement, this does not prove that the parties did not intend to enforce the covenant not to compete. Petitioner also argues that he gave up his rights as a stockholder when he released his right of action against Cornell; and that the release was part of the consideration for the payments he received because it was equivalent to the sale or exchange of a capital asset. We reject this argument for the following reasons. First, the agreement whereby petitioner released his right to an action against Cornell is vaguely worded and we are not at all convinced that transactions prior to the execution of that agreement are covered by the language: I will interpose no objection as such stockholder to any action which you [Cornell] may take as a creditor and/or stockholder of the Tobe Deutschmann Corporation * * *. [Emphasis added.] Second, petitioner agrees that on the Deutschmann Corporation's books of account his stock had no value on September 17, 1959. Merely asserting that it might have had value after a minority stockholder suit does not prove that in releasing his right to bring an action the petitioner was in effect giving up any positive value in his stock. This *82 is especially true because the Deutschmann Corporation had outstanding obligations of over $2,000,000 when it ceased doing business in 1959. And, third, petitioner did retain the right to receive any dividends or increment in the value of his stock, as well as the right to sell it. Under these facts and circumstances we conclude that the payments made by Cornell to the petitioner in 1959 and 1960 were received for his covenant not to compete and his availability for consulting services. Accordingly, such amounts are taxable as ordinary income. Having reached this conclusion, we need not consider the three methods suggested by petitioner for allocating such payments. As to the second issue, the petitioners did not file their joint Federal income tax returns for the taxable years 1959 and 1960 within the time prescribed by law. In their petition they alleged that the failure to do so was due to reasonable cause. However, neither at trial nor on brief do petitioners mention the alleged "reasonable cause" for not filing timely returns. Therefore, we must sustain the respondent's determination with respect to the addition to tax under section 6651(a) for failure of proof. Joseph J. O'Donohue, 33 T.C. 698, 701 (1960); *83 and Rudolf A. Zivnuska, 33 T.C. 226, 239 (1959). Decision will be entered for the respondent.